**IN THE**
**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **JAMES V. MURDOCK, JR. , TONYA HOEFKE** ) | |
| **DONALD FULK, DEBRA RILEY,** ) | |
| **TRAVARES HUMPRHIRES, SHANE TAYLOR,** ) | |
| **GABRIEL ENGLAND, and HOWARD HODGES** ) | |
| **individually and on behalf of all** ) | |
| **others similarly situated,** ) | |
| ) | |
| **Plaintiffs** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **ROGER E. WALKER, Director of  Illinois** ) | No.  08-C-1142 |
| **Department of Corrections,** ) | |
| **JESSE MONTGOMERY, Deputy  Director** ) | **Honorable Blanche Manning** |
| **of Parole Operations, and** ) | **Presiding** |
| **JORGE MONTES, Chairman Illinois** ) | |
| **Prisoner Review Board,** ) | |
| **JAMES REINHART, Chief of Staff** ) | |
| **Illinois Department of Corrections,** ) | |
| **in their individual and official capacities** ) | |
| ) | |
| **Defendants** ) | |
| ) | |

**AMENDED COMPLAINT**

**COUNT 1**

Plaintiffs, James V. Murdock, Jr.,  Tonya Hoefke, Donald Fulk, Debra Riley,

Tavares Humphries, Shane Taylor, Gabriel England, and Howard Hodges on behalf of

themselves and all other persons similarly situated, through their attorneys, Thomas

Peters, Gil Sapir, and Kevin Peters, state as follows:

## PARTIES, JURISDICTION AND VENUE

1. James Murdock successfully completed his prison term on or about April 11, 2004 but was then unlawfully imprisoned at the Stateville Correctional Center from April 11, 2005 until March, 28, 2007, and again from January 18, 2008 to March 26, 2008. Murdock is currently on parole and electronic monitoring.

2. Plaintiff Tonya Hoefke  successfully completed her prison term on May 8, 2006, but was unlawfully imprisoned at Dwight Correctional Center from May 8, 2006, to March 23, 2007.

3. Plaintiff Donald Fulk successfully completed his prison term on July 13, 2005, but was unlawfully imprisoned from July 13, 2005 to July 13, 2006.

4. Plaintiff Debra Riley successfully completed her prison term on March 14, 2006, but was unlawfully imprisoned at Dwight Correctional Center from March 14, 2006, to October 5, 2006.

5. Plaintiff Tavares Humphries successfully completed his prison term on February 4, 2008, and has been unlawfully imprisoned at Lawrence Correctional Center until his recent release.

6. Plaintiff Shane Taylor successfully completed his prison term on September 1, 2007, but he has been unlawfully imprisoned at Shawnee Correctional Center since that date.

2

7. Plaintiff Gabriel England successfully completed his prison term on October 3, 2007, but he has been unlawfully imprisoned at Lawrence Correctional Center since that date.

8. Plaintiff Howard Hodges successfully completed his prison term on or about June 26, 2008, but he has been unlawfully imprisoned at Western Correctional Center since that date.

9. Each of these Plaintiffs was unlawfully detained in prison as a direct and proximate result of an unconstitutional policy and practice of the Defendants.

10. Defendant Walker is the Director of the Illinois Department of Corrections (hereafter IDOC). In that capacity, Walker sets the policies and practices relating to Illinois parolees and, in particular, he established and enforces IDOC's guidelines with respect to the release of sex offenders. Walker is sued in his individual and official capacities.

11. Defendant Montgomery is the Deputy Director of Parole for the Illinois Department of Corrections. In that capacity, he implements the policies of Defendant Walker and trains other IDOC employees in accordance with those policies and practices. Montgomery is sued in his individual and official capacities.

12. Defendant Montes is the Chairman of the Illinois Prisoner Review Board (PRB) and in that capacity he sets the policies of the Illinois Prisoner Review Board. He is sued in his individual and official capacities.

13. Defendant James Reinhart is an individual, duly authorized agent and employee of IDOC and he was the Chief of Staff for the Illinois Department of Corrections during all times relevant to this action.  Defendant Reinhart was acting in that capacity and under color of the laws of the State of Illinois during all times relevant to this action. He is sued in his individual and official capacities.

14.  All of the acts and omissions alleged in this complaint were made under color of state law.

15.  This action is brought pursuant to  42 U.S.C. §1983 for violations of Plaintiff's constitutional rights under the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.  The Court has jurisdiction based on 28 U.S.C. §§ 1331, 1343(a), 2201.

16. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to these claims occurred in this District and at least one of the Defendants reside in this District.

17.  All of the Defendants maintain offices and do business in or near Chicago, Illinois, and the site for all of the preliminary parole revocation hearings is within this District.

### COMMON FACTS AND THE "TURN AROUND" POLICY

18. After an Illinois inmate has served his or her term of imprisonment, the inmate must be released from prison but the inmate remains under the jurisdiction of IDOC

during a fixed period of mandatory supervised release, which is commonly referred to as "parole".  730 ILCS 5/3-3-3(c); 730 ILCS 5/5-8-1(d).

19.  By legislative mandate, the Prisoner Review Board (PRB) is the only entity with "the authority for setting conditions for . . . mandatory supervised release."  730 ILCS 5/3-3-1(a)(5).  IDOC has no such authority.

20. Parole agents employed by IDOC, and working under the supervision of Defendants Montgomery and Reinhardt, are charged with supervising individuals on MSR.  If a parole agent believes a person serving on MSR has violated the terms of the MSR, the parole agent may charge the parolee with a violation.

21. The PRB is the only agency that is authorized by law to determine "whether a violation of those conditions warrant revocation of parole or mandatory supervised release or the imposition of other sanctions."  730 ILCS 5/3-3-1(a)(5).  IDOC has no such authority.

22. Parolees are entitled to hearings before the PRB to determine whether an alleged MSR violation has occurred.  730 ILCS 5/3-3-2(a)(5)(f).  After the hearing, the PRB makes its determination.  If a MSR violation has not occurred, then there is no lawful basis for keeping an individual in prison.

23. There is no provision under Illinois law that allows IDOC  to overrule a decision of the PRB to release an inmate to parole.  Nor is there any provision under Illinois law that allows IDOC to issue a parole violation before the parolee is even

released from prison.

24.   Nonetheless, on or about June 2005, Defendant Walker established a policy prohibiting the release of inmates convicted of sex offenses without his approval, regardless of the PRB's determinations.

25. With the assistance of his Staff, including Defendants Reinhart and Montgomery, Defendant Walker developed, implemented, and continues to enforce the "turn around" policy described herein.

26.   Before implementation of Defendants" turn around policy, inmates classified as "sexual offenders" were released on mandatory supervised release (MSR) either by order of the  PRB following a parole release hearing for a C- number (indeterminate sentence) inmates or by statutory mandate upon completion of a determinate sentence.

27.   Before being released, a "sex offender," whether serving an indeterminate or a determinate sentence, must submit a host site (residence) and his parole plans must be approved by the PRB, acting under the supervision of Defendant Montes.

28.   With respect to C-number inmates, who have indeterminate sentences, the PRB conducts parole release hearings, usually annually, to decide when and under what circumstances the "sex offender" may be released.

29.   Once the PRB orders the release on parole, the inmate has a protected liberty interest, which Defendants cannot unilaterally revoke or arbitrarily deny.

30.   With respect to all other IDOC inmates, release is a statutory function of their

6

determinate sentences. Most must serve half of their sentence and others must serve either 85% or 100% of their sentence.

31.  As to non-C number inmates, their release dates are determined by the sentence imposed and the statutory requirements that automatically attach to the sentence. Those statutory requirements establish whether the inmate must serve 50%, 85% or 100% of the sentence.  ( An inmate with a 10 year sentence serving 50% is entitled to release after 5 years)

32.   The PRB  imposes conditions of release for inmates (non C-numbers) who have statutorily mandated outdates. As to theses inmates, the PRB is the only agency authorized to deny release on parole and the only agency authorized to establish conditions of parole before release.

33.  Nonetheless, in many cases, Defendants, Walker and Montgomery, refuse to release a "sex offender" as ordered by the PRB, in accordance with the PRB's exclusive right to control the date and the conditions of release for all inmates..

34.  Instead, Defendants, Walker and Montogomery, acting through their agents and IDOC employees, inform parolees that a parole violation occurred solely as a result of an alleged failure to have an approved home site.

35.  As a result of Defendants' policy and practice, an inmate designated for release on parole by the PRB is charged with a parole violation before leaving the prison. The alleged "violation" is based upon an alleged failure to have an approved host site,

even though the PRB has already approved release to a site.

36.  In most cases the paroled inmate is literally walked to the front gate, as if he were about to be released, and then handed a notice of the alleged host site violation. Because these parolees are turned around at the prison gate before getting outside of the prison, this practice is commonly known as IDOC's "turnaround" policy.

37. After being charged with the alleged parole violation, the parolee is placed in punitive segregation and often is transferred to another prison.  As a result, the paroled inmate is denied access to family and to counsel and is held under conditions that are significantly harsher than inmates who are in general population status.

38. Failure to have an "approved" home site is not a MSR violation, when the PRB has approved release to a site. Nevertheless, Defendants, Walker and Montgomery, refuse to release hundreds of lawfully paroled inmates, thereby depriving them of their liberty without due process of law.

39.  As a result, individuals who successfully completed their prison terms have spent, and are spending, up to three years in prison after their lawful release dates.

40.  All of the Defendants are aware of this "turn around" practice and have knowingly caused, or allowed, hundreds of eligible parolees to remain in IDOC solely on the unfounded allegation that the parolee does not have an approved host site.

41.  None of the Defendants provide the "paroled" inmate with meaningful advance notice that the host site, as approved by the PRB, was rejected by IDOC.  Nor do

any of the Defendants provide inmates with the opportunity or the means to correct any perceived deficiency in the host site.

42.   In most cases the host site is a family member or friend of the parolee because the parolee does not have sufficient funds to either a) locate independent living sites or b) rent an apartment independent of family or friends.  Lack of funds is by far the most common reason paroled inmates are not able to secure an IDOC approved host site

43.   After an inmate who was scheduled for release by the PRB is denied release by IDOC, a parole  revocation hearing is conducted .When these "turn around" parolees finally appear before the PRB, the PRB finds the parolee did not violate their MSR terms. The parolee  is again scheduled by the PRB for release and the turn around cycle resumes.

44.  Defendants Walker and Montgomery again deny release and re-file another alleged host site violation, even though the PRB has already heard and denied the same unfounded allegation. Nonetheless, based on the new charge, the parolee is again placed in punitive segregation, usually is transferred to a new facility, and the whole process begins anew.

45.  As a result, the paroled inmate is denied his constitutional right to release as approved by the PRB and the IDOC incurs substantial, unnecessary costs for the continued incarceration of the paroled inmates.  The cost of re-incarceration substantially exceeds the cost of parole supervision so the turn around policy is not only unconstitutional it also is a financial drain on an already overburdened system..

46. Defendants, Walker and Montgomery, know their turn around policy deliberately contravenes Illinois law, which clearly and unambiguously mandates that the PRB is the only agency allowed to authorize release on parole, conduct parole hearings, and determine whether a parole violation has occurred.

47. Defendants, Walker and Montgomery, know that their turn around policy contravenes the PRB's clearly established statutory authority to set conditions for MSR and to make the final determination regarding a violation of those conditions occurred.

48. Defendants' statewide disregard for the PRB's determinations is intentional and deprives Plaintiffs of their right to equal protection and to due process of law.

49. Defendants' deliberate indifference to the PRB's authority and to Plaintiffs' due process and equal protection rights is so arbitrary that it shocks the conscience.

## James V. Murdock, Jr.

50. In January 1967, James Murdock, Jr. was convicted of deviate sexual assault and sentenced to a term of 40 to 120 years. He was assigned a C-number and became eligible for release on parole after serving approximately twelve years.

51. After serving 29 years, Murdock was paroled by order of the PRB on or about April 12, 2004, to an approved location.

52. Murdock's release was conditioned on home confinement, electronic monitoring, weekly sex counseling, and participation in educational programs for sex

10

offenders.

53. Following his release on parole, Murdock was assigned a parole agent in Cook County, and Plaintiff complied with all of the conditions of his parole for the next year.

54. On or about April 11, 2005, Murdock was returned to IDOC because his granddaughter moved into the host site where Murdock resided. Since his granddaughter was a minor, Murdock was no longer allowed to live in the previously approved host site.

55. Murdock was charged by his parole agent with violating his parole in that Murdock no longer had an approved host site. Murdock was taken into custody, transported to an IDOC facility, and then placed in punitive segregation.

56. Murdock was not provided an opportunity to secure a different host site, when his granddaughter moved into Murdock's previously approved host site.

57. Murdock could have located and rented an acceptable host site, but he lacked sufficient financial resources to find one on such short notice. Also, he was not provided a reasonable opportunity to locate new housing.

58. On or about May 10, 2005, the Prisoner Review Board determined that Murdock had not violated his parole because a) he did not intentionally or even negligently violate the host site provision of his release terms and b) he was at all times willing to live at another, suitable host site.

59. Following the PRB's decision, finding no parole violation, Murdock was walked to the front gate of the IDOC facility where he was being held. When he reached

the front gate of the IDOC facility, he again was charged with a parole violation - not having a suitable host site - and again placed in segregation.

60.  After several days Murdock was released from segregation and another parole revocation hearing was scheduled.

61.  When Murdock next received his parole revocation hearing, the PRB again found "no violation" and again ordered his release.

62.  Defendants Walker, Reinhart, and Montgomery, nonetheless refused to release Murdock and he was charged with the same host site violation the PRB had already rejected.

63.  This scenario was repeated on each of the following dates: June 1, 2005; June 29, 2005; August 25, 2005; October 28, 2005; November 22, 2005; and July 25, 2006.

64. As a result of Defendants' (Walker, Reinhart and Montgomery) policy and practice, Murdock remained in custody from April 11, 2005, until March 28, 2007, even though the PRB ordered his release on numerous occasions.

65. On or about March 28, 2007, Murdock was again approved for parole with electronic monitoring.  This time Murdock was released to 12233 S. Sangamon, Chicago, Illinois.

66.  From March 28, 2007 until January 26, 2008, Murdock remained on parole and resided at that location without incident.  Murdock complied with all of the conditions of his parole and had adjusted well to living on his own in Chicago.

67. On or about January 26, 2008, a fire occurred at Murdock's host site. Murdock promptly reported the fire to his parole officer.

68.  The parole officer determined the host site was not habitable. Murdock offered to move into another residences or a hotel to comply with conditions of his parole.

69.  The parole officer, without inspecting them,  alleged that alternative host sites were not acceptable and took Murdock into custody on or about January 26, 2008. Murdock was charged with violating his parole in that, through no fault of his own, the assigned host site was uninhabitable.

70. After Murdock was returned to IDOC, a parole revocation hearing was held by the PRB, which again found that Murock had not violated the terms of his parole.

71.   After serving approximately two months in prison, on March 26, 2008, Murdock was released from Stateville by the IDOC to live at 12531 S. Ashland in Chicago, Illinois.

### Tonya Hoefke

72.  In 2001, Plaintiff Tonya Hoefke, at age 17, was convicted of a misdemeanor sex offense and sentenced to probation, but she was required to register as a sex offender.

73. On September 28, 2005,  Ms. Hoefke was arrested for burglary and for failure to register as a sex offender.  She was convicted and sent to Dwight Correctional Center with a release date of  May 8, 2006.

74 . On that date, IDOC found Ms. Hoefke  violated the terms of her MSR by not

having an IDOC approved host site, and she was turned around at the gate.  IDOC did not

"approve" her mother's address in Rock Falls, Illinois because Ms. Hoefke's own

children lived there.

75. On August 3, 2005 Ms. Hoefke appeared before the PRB.  She was found not

to be a violator and ordered to be released from prison.

76.   IDOC again turned her around at the prison gate.  IDOC  determined Ms.

Hoefke violated her MSR because IDOC had not approved her proposed address, despite

knowing its failure to "approve" her address was not an MSR violation, as previously

determined by the PRB.

77. There were other sites in close proximity to Ms. Hoefke's proposed site.

However, these other sites cost more to rent and Ms. Hoefke could not afford them. As a

result, Ms. Hoefke remained unlawfully imprisoned at Dwight Correctional Center until

the expiration of her MSR term on March 23, 2007.

### Donald Fulk

78.  In 2001, Plaintiff Donald Fulk, at age 17, was convicted of  misdemeanor

criminal sexual abuse stemming from a consensual relationship he had with a 16 year-old

girl friend. He was required to register as a sex offender.

79. On February 11, 2004, Mr. Fulk was convicted of an unrelated offense and sent

to Jacksonville Correctional Center.  His release date was July 13, 2005.  He was

supposed to go to a halfway house, but the site was denied for lack of space two days

before Mr. Fulk was scheduled for release.

80.  IDOC determined Mr. Fulk had violated the terms of his MSR and he was

turned around at the gate. On August 30, 2005,  Mr. Fulk appeared before the PRB and he

was found not to be a violator and ordered released from prison.

81. IDOC again turned him around at the prison gate for the same alleged host site

violation because IDOC "had no success in finding a suitable host site."

82. Mr. Fulk did not have funds to rent a suitable host site and was denied release

solely because he lacked sufficient funds to rent a suitable apartment. There were suitable

locations in the vicinity of Mr. Fulk's designated release site by PRB, but his lack of

funds prevented him from renting at those locations.

83. Mr. Fulk remained unlawfully imprisoned in various IDOC facilities until the

expiration of his MSR term on July 13, 2006.

84. Mr. Fulk's continued incarceration throughout that time was caused by

Defendants' turnaround policy.

**Debra Riley**

85. In 1994, Plaintiff Debra Riley was convicted of aggravated criminal sexual

assault for failing to report her husband's crimes against a child.

86. Her statutory release date was March 24, 2006.  On that date, Ms. Riley was

informed by IDOC personnel, acting pursuant to Defendants' turn around policy, that she

had violated the terms of her MSR and she was turned around at the gate..

15

87.  IDOC did not "approve" her parents' home address in Orland Park, Illinois because it allegedly was "too close" to a park.  Ms. Riley had no prior notice of the alleged problem with the proposed host site and could have corrected the problem had she been given any notice.

88. On August 3, 2006, Ms. Riley appeared before the PRB.  She was found not to be a violator and ordered released from prison.

89.  IDOC again turned her around at the prison gate because IDOC still had not approved  her proposed address, even though IDOC personnel knew its failure to "approve" her address was not an MSR violation, as lawfully determined by the PRB.

90.  Debra Riley remained unlawfully imprisoned at Dwight Correctional Center until October 5, 2006.

**Tavares Humphries**

91.  As a minor, Tavares Humphries was convicted of a misdemeanor sex offense. Because of this juvenile offense, Mr. Humphries is required to register as a sex offender.

92.  In 2006, after being released from prison on an adult  drug-related charge, Mr. Humphries was charged with not properly registering as a sex offender and received a one year sentence.

93.  With good time, Mr. Humphries should have been released in 60 days; however, he was turned around for failure to have an approved address and was not released from prison until his maximum mandatory supervised release period was

completed in early 2007.

94.  Following that release Mr Humphries was re-incarcerated for an unrelated

charge. On February 4, 2008, Mr. Humphries was scheduled for release on MSR for this

offense MSR.

95.  On that day, Mr. Humphries was informed by IDOC personnel that he violated

the terms of his MSR and was turned around at the gate.  IDOC did not "approve" any of

Mr. Humprhies's host sites for electronic monitoring, even though those host sites were

not in violation of the PRB's orders.

95.  Mr. Humphries was not given advance notice of the alleged host site

violations and he could have corrected the alleged violations, if he had received timely

notice of the violation.

### Shane Taylor

96.  On August 10, 1999, at age13, Shane Taylor pled guilty to a juvenile charge of

Criminal Sexual Abuse.  Because of his plea, Mr. Taylor is required to register as a sex

offender for ten years.

97. In 2005, Mr. Taylor was convicted of a non-sexual offense.  He was scheduled

for release on MSR on September 1, 2007.  On that date, Mr. Taylor was told he violated

the terms of his MSR and was turned around at the gate because IDOC did not "approve"

Mr. Taylor's host sites for electronic monitoring.

98. On October 23, 2007, and December 12, 2007, Mr. Taylor appeared before the

PRB and was ordered released by the PRB as no violation had occurred.. To this date, Mr.

Taylor remains unlawfully imprisoned, even though the PRB has found that  he did not

violate the release terms, as lawfully set by the PRB.

### Gabriel England

99. On or about June 3, 2004, Gabriel England was found guilty of aggravated

sexual abuse and sentenced to 6 years in the IDOC. On October 3, 2007, Mr. England

completed his determinate sentence.

100.  On that date, Mr. England was told by IDOC personnel that he had violated

the terms of his MSR and was turned around at the gate.  Mr. England was violated

because IDOC did not approve a host site for electronic monitoring.

101. On December 10, 2007, Mr. England appeared before the PRB and he was

found not to be in violation of the terms of his MSR. The PRB ordered that he was to be

released the next day.

102.  On December 11, 2007, he was turned around at the gate for an alleged

violation of the terms of his MSR in that IDOC personnel had not approved his proposed

address.

### Howard Hodges

103.  In December, 1996, Howard Hodges was convicted of aggravated sexual

assault with a weapon. In January, 2004, Mr. Hodges was convicted of a narcotics

offenses and he was sentenced to 3 years in the IDOC..

104.  In November, 2007,  Mr. Hodges was paroled to 8711 Cottage Grove, Chicago, Illinois.  On March, 28, 2008, he was returned to the IDOC for an alleged failure to register but he was later released.

105.  His new release date was June 26, 2008, and approximately two months before that he submitted a parole plan that including a residence in Park Forest, Illinois.

106. On or about June 26, 2008, the IDOC violated Mr. Hodges parole for an alleged host site violation, even though IDOC had not checked the proposed residence. He was residing at a PRB approved location.

107.  Mr. Hodges was not given reasonable notice of the alleged violation nor was he given an opportunity to correct the alleged violation.  He has remained at the Western Illinois Correctional facility since June, 2008, even though there are suitable locations and conditions of release as determined by the PRB.

108.  Defendants' turn around policy violates Plaintiffs' constitutional rights to due process and to equal protection of the laws of their liberty without due process of law. Defendants' flagrant, knowing and deliberate disregard of Plaintiffs' due process and equal protection rights is so arbitrary and oppressive that it shocks the conscience.

Wherefore, Plaintiffs respectfully request the Court will  a) enter preliminary and permanent injunctions prohibiting enforcement of Defendants' turn around policy;  b) declare Defendants' turn around policy violates the Due Process and the Equal Protection Clauses of the United States Constitution; and c) award damages, costs and reasonable

19

attorneys' fees to Plaintiffs.

## COUNT II_____

## CLASS ACTION ALLEGATIONS

1-108. Plaintiffs re-allege paragraphs 1 to 108 of Count I as paragraphs 1 to 108 of Count II

109. Plaintiffs bring this Count as a class action pursuant to Federal Rule of Civil Procedure 23 (b)(2) and (b)(3) on behalf of all similarly situated individuals who have been turned around by IDOC.

### The Injunctive Relief Class

110. The Injunctive Relief Class consists of individuals currently imprisoned by IDOC who were turned around by IDOC as MSR violators, then determined by the PRB not to be MSR violators.

111. The members of the Injunctive Relief Class are so numerous that joinder of all members is impracticable:

A) IDOC has been implementing its turnaround policy for over two years;

B) There are hundreds of members in the Injunctive Relief Class; and

C) The number of Injunctive Relief Class members will increase since IDOC continues to implement its turnaround policy, thereby depriving additional class members of their liberty interest without due process. .

112. Common issues of law and fact exist as to all members of the Injunctive

Relief Class and predominate over any questions solely affecting individual members.

Among these questions are:

A) whether Illinois law creates a liberty interest protected by due process of the law under the Fourteenth Amendment of the United States Constitution;

B) whether Defendants' refusal to let the Injunctive Relief Class members out of prison, after the PRB determines that they are not violators of their MSR terms, deprives the Injunctive Relief Class of their liberty without due process of the law and in violation of the Fourteenth Amendment of the Constitution; and

C) whether members of the Injunctive Relief Class are entitled to injunctive or declaratory relief.

113.  The claims of the named class representatives are typical of the claims of all the Injunctive Relief Class members, since all Injunctive Relief Class members are similarly affected by Defendants' actions.

114.  Plaintiffs will fairly and adequately protect the interests of the Injunctive Relief Class and have retained counsel who are competent and experienced in civil rights litigation.  There are no conflicts of interest among the Injunctive Relief Class, as all members seek similar forms of relief.

**The Damages Class**

115.  The proposed Damages Class consists of individuals formerly imprisoned by IDOC who were turned around by IDOC as MSR violators, found by the PRB not to be

21

MSR violators, but are now released.

116.  The members of the Damages Class are so numerous that joinder of all members is impracticable.

A)   IDOC has been implementing its turnaround policy for over two years. There are hundreds of members in the Damages Class; and .

B) The number of Damages Class members will increase as IDOC continues to implement its turnaround policy, thereby depriving additional class members of their liberty interest without due process.  Plaintiffs will be able to ascertain the exact number of Damages Class members through appropriate discovery.

117.  Common issues of law and fact exist as to all members of the Damages Class and predominate over any questions solely affecting individual members.  Among these questions are:

A) whether Illinois law creates a liberty interest protected by due process of the law under the Fourteenth Amendment of the United States Constitution;

B) whether Defendants' refusal to let the Damage Class members out of prison, after the PRB determines they are not violators of their MSR terms, deprived the Damages Class of their liberty without due process of the law and in violation of the Fourteenth Amendment of the Constitution; and

C) whether members of the Damages Class are entitled to damages.

118. The named class representatives' claims are typical of the claims of all

Damages Class members, since all Damages Class members are similarly affected by Defendants' actions.

119. Plaintiffs will fairly and adequately protect the interests of the Damages Class and have retained counsel who are competent and experienced in civil rights litigation. There are no conflicts of interest among the Damages Class, as all members seek similar forms of relief.

120. A class action is the superior method for adjudication of this controversy in terms of both fairness and judicial economy. Because the two proposed classes are so numerous that joinder of all members is impracticable, common issues of law and fact predominate among the classes, and members of the respective classes seek similar forms of relief, adjudication of this controversy as a class action serves fairness and efficiency.

WHEREFORE, Plaintiffs respectfully requests  this Honorable Court find in their favor and against Defendants on all claims and award the following relief:

A) Equitable relief for the Injunctive Relief Class, including:

1) a declaratory judgment that Defendants are depriving Injunctive Relief Class  members of their liberty in violation of the Fourteenth Amendment; and

2) a preliminary and permanent injunction directing Defendants to comply with all PRB findings related to MSR decisions;

B) Compensatory damages, cost and reasonable attorneys fees for Damages Class members' for their unlawful imprisonment by IDOC and for the emotional distress caused

by Defendants' unconstitutional policy and practice;

C) Punitive damages for Damages Class members to sanction Defendants' deliberate, knowing, and systematic misconduct to deter Defendants and others from similar actions in the future;

D) Any other relief which this Court may deem necessary, just and proper; and

E) Reasonable attorneys' fees and costs.

Respectfully Submitted,

S/ Thomas Peters
THOMAS PETERS, GIL SAPIR, KEVIN PETERS
ATTORNEYS FOR PLAINTIFF
407 S. Dearborn, Suite 1675
Chicago, IL 60605
(312) 697-0022

24