IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION      **MJC**

| | |
|---|---|
| **JAMES V. MURDOCK, JR., et al.,** | ) |
| | ) |
| Plaintiffs, | ) |
| | ) No. 08 CV 1142 |
| v. | ) |
| | ) Honorable Blanche Manning, |
| **ROGER E. WALKER, et al.,** | ) Presiding |
| | ) |
| Defendants. | ) |
| | ) |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS**

**INTRODUCTION**

The Second Amended Complaint alleges three overlapping constitutional claims and a related state claim. The first constitutional claim derives from Defendants' policy of usurping the lawful orders of the Illinois Prisoner Review Board (PRB). (Doc. No. 57, at p. 5). Although Defendants are not authorized by Illinois law to deny release on parole, Defendants overstep their statutory powers and deny release. (Doc. No. 57, at p. 10). To make matters worse, Defendants fail to provide notice and a hearing in advance of their arbitrary and unauthorized decision to deny release. That constitutional violation is compounded when Defendants deny release solely because the parolee is indigent. See, *Tate v. Short*, 401 U.S. 395, 397 (1971). The third constitutional claim evolves from Defendants' practices following release on parole. Parolees who are residing in suitable housing are subject to immediate re-incarceration when, through no fault of their own, a change in circumstance causes their housing to become

1

unsuitable or unavailable. This aspect of Defendants' policy unconstitutionally imposes punishment for a change in circumstance that was neither foreseeable nor preventable by the parolee. But see, *Morrissey*, 408 U.S. at 481-84 – society has no interest in revoking parole unless the parolee has knowingly violated the conditions of parole.

In the following Sections, Plaintiffs: (1) set out the standard of review that applies to all motions to dismiss; (2) prove they have alleged facts that more than satisfy the notice pleading requirements for federal claims; (3) establish that they have standing to pursue injunctive relief; (4) prove that Defendants' policy is both unconstitutional and in violation of state law; and (5) establish that they have standing to secure declaratory and injunctive relief, in addition to their damage claims.

## STANDARD OF REVIEW

The only issue before the Court is whether Plaintiffs have stated a claim. *Conley v. Gibson*, 355 U.S. 41, 45, 46 (1957). Who will prevail on the facts is an issue for a later day. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). For now, the Court must take as true every allegation in the Second Amended Complaint, and the Court must draw every reasonable inference in favor of the Plaintiffs. *Id*. As applied here, the Court must consider the allegations describing how Defendants' "turnaround policy" works, and the Court must take as true Plaintiffs' allegations that the Defendants know of, approve, and enforce that policy. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Defendants nonetheless assert that Plaintiffs' allegations are either conclusory or are legal conclusions and, therefore, fail to provide sufficient factual detail. (Doc. No. 74, at pp. 4,5). Defendants' assertion is plainly wrong.

Defendants are the IDOC personnel who run the department. (Doc. No. 57, at pp. 1-3). By virtue of their positions within the IDOC, Defendants are authorized to establish and enforce

statewide policies. Plaintiffs specifically allege that the Defendants established and continue to enforce a "turnaround policy" that results in prolonged incarceration in violation of the Due Process Clause and the Equal Protection Clause. Those general allegations are supported by a detailed description of how Defendants' policy is applied to all inmates who are convicted of sex offenses. (Id). Plaintiffs then describe in detail how Defendants' policy was applied to them. The allegations include the details of the policy and the specific manner in which Defendants' policy was applied to each Plaintiff. (Doc. No. 57, at pp. 8-18). Plaintiffs, in that respect, have gone far beyond "notice" pleading and have provided a roadmap for Defendants and the Court. By following that map, Defendants' policy is made clear to all. Thus, Defendants' assertion that the Second Amended Complaint lacks specificity is clearly mistaken.

## THE "TURNAROUND POLICY" AS APPLIED TO PLAINTIFFS.

The Prisoner Review Board (PRB) is the only entity with "the authority for setting conditions for . . . mandatory supervised release." 730 ILCS 5/3-3-1(a)(5). (Doc. No. 57, at p. 5, ¶ 19). Before being released, a "sex offender" must submit a host site (residence) to the PRB, and his parole plans, must be approved by the PRB. (Doc. No. 57, at pp. 8-11). After the PRB reviews the parolee's release plans an order is entered by the PRB directing the release of the parolee. (Doc. No. 57, at pp. 8-11). These release orders are entered weeks before the actual release date. (Id.).

At that point, Defendants are informed of the release date, and it becomes Defendants' duty to release the parolee on the date set by the PRB. (Id.). Instead, the paroled inmate is walked to the front gate, as if he were about to be released, and handed a notice of an alleged host site violation. (Id.). The parolee then is "turned around" and escorted back to his cell. When these "turnaround" parolees appear before the PRB, the PRB finds that the parolee did not

3

violate his parole release terms. The parolee again is scheduled by the PRB for release and the turnaround cycle resumes. (Id.). Thus, the Second Amended Complaint describes with specificity how the "turnaround policy" works.

The Second Amended Complaint proceeds to describe how Defendants' policy was applied to each of the named Plaintiffs. (Doc. No. 57, at 11-18). For example, Plaintiffs allege that on May 10, 2005, the Prisoner Review Board determined that Murdock was eligible for release on parole to a pre-approved host site. (Id.). Following the PRB's decision, Murdock was walked to the front gate of the IDOC facility. (Id.). When he reached the front gate, he was charged with an alleged host site violation, and he was "turned around." This scenario was repeated on: June 1, 2005; June 29, 2005; August 25, 2005; October 28, 2005; November 22, 2005; and July 25, 2006. Murdock was turned around at the prison gate eight times. (Id.). The Second Amended Complaint provides similar details with respect to all of the named Plaintiffs. (Doc. No. 57, at p 13-19). Thus, the complaint is fact specific, does not rely on generalities or conclusory allegations, and more than satisfies federal notice pleading requirements.

**PLAINTIFFS HAVE STANDING TO SEEK INJUNCTIVE RELIEF.**

Defendants next maintain that Plaintiffs do not have standing to seek declaratory and injunctive relief. (Doc. No. 74, at 3-6). According to the Defendants, since all of the Plaintiffs have been released from IDOC custody, Plaintiffs do not have standing to sue for an injunction. (Id.). Defendants mistakenly claim that *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) holds that plaintiffs do not have standing, unless they are likely to be re-incarcerated and again denied release based on Defendants' turnaround policy. Proceeding from that false premise, Defendants then conclude that Plaintiffs cannot meet that standing hurdle, so Plaintiffs' equitable claims must be dismissed as moot. Aside from the obvious fact that Defendants' contention does

not affect Plaintiffs' damage claims, Defendants also misapprehend the relevant standing rules. *Lyons* does not require plaintiffs who file suit while still suffering the adverse effects of the challenged policy to prove they will be re-incarcerated. See also, *Lewis v. Casey*, 494 U.S. 472, 481 (1990).

The circumstances existing when suit is filed determine the rules governing standing. *Lewis*, 494 U.S. at 481. There are two scenarios that allow for standing after a party's claim otherwise would be moot. The first scenario involves cases challenging transitory claims - cases where the requested relief is provided before judicial review is likely to be complete. *Id.* The "relation back" doctrine applies to transitory deprivations that are "capable of repetition" yet likely to evade judicial review. *Id.* When the relation back doctrine applies, the putative plaintiff is not required to establish that he is "reasonably likely" to be subjected to the same unconstitutional policy in the future. *Id.* The plaintiff must file the suit while he still is being harmed by the unconstitutional policy and the harm must be transitory. But the plaintiff is not required to prove a likelihood of future injury. *Gerstein v. Pugh*, 420 U.S. 103 (1975).

The second scenario is illustrated by *Lyons*, where the plaintiff filed suit after the unconstitutional harm had ended. When confronted with this circumstance, the plaintiff must show a "reasonable expectation that [he will] be subjected to the same [policy or practice] again." *Lewis*, 494 U.S. at 84. *Lyons* adopted the reasoning from O'Shea v. Littleton, 419 U.S. 488, 495-96 (1974) that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... **if unaccompanied by any continuing, present adverse effects**." (emphasis added). Thus, the crucial distinction is whether there are "continuing, present adverse effects," when suit was filed. *Id.*

5

In *Lyons*, the plaintiff filed suit challenging the use of a choke hold by Los Angeles police officers. The suit was filed after the choke hold was released, a fact which was critical to the Supreme Court's analysis. The plaintiff did not have standing to seek equitable relief at the moment suit was filed because, by then, the choke hold had been released. Lyons, therefore, had to prove he was likely to be rearrested and choked a second time. Because it was unlikely Lyons would be arrested again, particularly under circumstances that might warrant the use of a choke hold, he did not have standing.

On the other hand, when suit is filed while the named plaintiff is suffering the direct effects of the unconstitutional policy, the plaintiff has a live, justiciable controversy. Under these circumstances, it is not necessary to establish a "likelihood" that the plaintiff will be subjected to the same policy in the future. *Delvin v. County of Kane*, 308 F.3d 673, 677-79 (7th Cir. 2002); *Whitlock v. Johnson*, 153 F.3d 380, 384 (7th Cir. 1998). In *Sosna v. Iowa*, 419 U.S. 393 (1975), for example, Carol Sosna filed a federal complaint challenging an Iowa residency rule, after her state court divorce petition was dismissed because she had not lived in Iowa for a full year. By the time her federal case reached the Supreme Court she was divorced, so her initially justiciable suit was moot. However, when Ms. Sosna filed her federal suit, Iowa law expressly prohibited her from filing for a divorce because she had not lived in Iowa for one year. Because the adverse effects were continuing at the moment her federal suit was filed, Ms. Sosna was not required to prove she was likely to face the same problem in the future. *Sosna*, 419 U. S., at 400.

*Gerstein v. Pugh*, 420 U.S. 103 (1972) further illustrates the same point. There, pretrial detainees challenged delays in their preliminary hearings. *Gerstein*, 420 U.S. at 105-06. The named plaintiffs had appeared in state court for their preliminary hearings long before a class

6

was certified, and all of them were convicted long before the federal case reached the Supreme Court. *Gernstein*, 420 U.S. at 111. Neither their subsequent convictions nor the fact that class certification occurred after the named representatives had received preliminary hearings caused mootness. As the Supreme Court explained, "Pretrial detention is by nature temporary, and it is most unlikely that any given individual could have his constitutional claim decided before he is either released or convicted." *Id.*

*United States Parole Commission v. Geraghty*, 445 U.S. 388 (1980) applied the same standing principles. Even though the plaintiff in *Geraghty* had been paroled and, therefore, he could safely assume he would not suffer a future harm resulting from defendants' parole release policy, the Supreme Court held that he had standing to seek declaratory and injunctive relief. When Geraghty filed suit, he was in prison and was being denied release on parole based on a policy that applied to him and to all other federal inmates. A live case or controversy existed when suit was filed, so his standing continued after he was released on parole.

In *County of Riverside v. Mc Laughlin*, 500 U.S. 44 (1991), the county defendants moved to dismiss a claim brought by pretrial detainees challenging delays in their first court appearances. *Id.*, at 48, 49. The defendants insisted that the *McLaughlin* plaintiffs lacked standing because they "would [never] again be subject to the allegedly unconstitutional conduct... ." *Id.*, at 48. The Supreme Court rejected that argument holding that when suit was filed "plaintiffs' injury was **at that moment** capable of being redressed through injunctive relief." *McLaughlin*, 500 U.S. at 51. emphasis added.

Here, each of the named Plaintiffs was in custody because of Defendants' turnaround policy when suit was filed. They, therefore, had standing to seek declaratory and injunctive relief

7

when the suit was filed, and their subsequent release from custody does not moot their equitable claims. *Id.*

**PAROLEES, WHO ARE IN IDOC CUSTODY WHEN THE ALLEGED HOST SITE VIOLATION OCCURS, ARE ENTITLED TO NOTICE AND A HEARING BEFORE THEIR SCHEDULED RELEASE DATES**.

In the previous Sections, Plaintiffs proved that the Second Amended Complaint provides sufficient factual detail to survive a motion to dismiss and that they have standing to seek injunctive relief. In this Section, Plaintiffs prove that their due process right to notice and a hearing, before they were turned around at the prison gate, was violated.

The government cannot deprive a person of life, liberty or property without notice and a hearing. *Morrissey v. Brewer*, 408 U.S. 471, 481-82 (1972). With rare exceptions, some form of notice and hearing must be provided before a liberty or property interest is altered by the government. *Fuentes v. Shevin*, 407 U.S. 67 (1972). Those rare exceptions apply only when exigent circumstances make it impractical, if not impossible, to provide notice and a hearing before the liberty interest is altered. *United States v. James Daniel Good Real Property*, 510 U.S. 43, 53 (1993).

In *Morrissy*, the Supreme Court held that a constitutionally protected liberty interest vests when a parole board orders an inmate's release on parole. See also, *Board of Pardons v. Allen*, 482 U.S. 369, 377-78 (1987); *Green v. McCall*, 822 F.2d 284 (2nd Cir. 1987). The Court's focus in *Morrissey* was on parolees who already resided in the free community. As to those parolees, the Court held that they may be arrested and detained without advance notice, as long as a prompt, post-arrest hearing is held. However, as the *Morrisssey* court aptly explained, due process is a flexible concept that recognizes "that not all situations calling for procedural safeguards call for the same kind of procedure." *Morrissey*, 408 U.S. at 481. When, as here,

8

parole authorities have advance notice of the alleged violation and the parolee already is in custody, due process requires notice and an informal hearing before the parolee is denied release.

When a parolee is released to the free community and violates parole, the violation usually is a new criminal offense. The parolee is arrested on the new charge and a parole violation report is issued. *Morrissey*, 408 U.S. at 485-86. Because the parole violation occurs without advance warning to the parole agent, it is impossible to provide notice and a hearing before the new offense occurs. *Id*. Out of necessity, the revocation hearing follows the actual violation. Unless the parolee were to call his agent in advance and inform him that the parolee planned to rob the neighborhood store the following day at noon, neither the agent nor the police would have grounds to charge a parole violation before the robbery occurred. Because parole agents learn after the fact that a violation occurred, the hearing procedure described in *Morrissey* necessarily commences after the violation has occurred. *Morrissey*, 408 U.S. at 482-84.

When, however, the issue is whether the parolee has secured suitable housing before his PRB ordered release date, a different result is dictated by the very different circumstances. *Morrissey*, 408 U.S., at 481. The parolee has submitted a housing site to the PRB for approval, and the PRB has approved the housing site before ordering release on parole. Only then does Defendants' turnaround policy come into play. Rather than release the parolee, Defendants' maintain that the PRB approved site is not satisfactory. Defendants base this allegation on information they receive before the parolee is actually released from prison, so there is time to provide notice and a hearing before the parolee's scheduled release date. Since "the State has no interest in revoking parole without some informal procedural guarantees," (*Morrissey*, 408 U.S. at 483) due process requires an informal hearing before the parolee's release date arrives.

9

Because Defendants claim to have knowledge of a host site violation before the parolee is released, there is time for notice and a hearing before the parolee's release date arrives. *Morrissey*, 408 U.S. at 484.

**DEFENDANTS CANNOT CONSTITUTIONALLY DENY RELEASE ON PAROLE SOLELY BECAUSE THE PAROLEE IS INDIGENT AND CANNOT AFFORD TO RENT SUITABLE HOUSING**.

In the previous Section, Plaintiffs proved that they are entitled to notice and a hearing before they are denied release because: (1) the PRB has issued a lawful order directing their release on parole; (2) Defendants know of the alleged host site violation before the parole release date has arrived; and (3) there is ample time to provide notice and an informal hearing before the release date arrives. In this Section, Plaintiffs prove that parolees cannot be denied release based solely on indigency.

Plaintiffs are not challenging Illinois' right to impose housing restrictions on parolees. However, when those restrictions run afoul of the Due Process Clause and the Equal Protection Clause, as they do here, the Court must consider whether alternative restrictions could serve the same purpose without creating a constitutional problem. *Bearden v. Georgia*, 461 U.S. 660, 664-67 (1983). This principle of statutory interpretation is commonly referred to as the "rule of constitutional avoidance." *Milavets, Gallop, & Milavetz v. United States*, ___ S. Ct.____ 2010 WL 757616, at p.6 (March 8, 2010). Whenever possible, federal courts must construe statutes in such a way that constitutional problems are avoided. *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades*, 485 U.S. 568, 575, (1988) – the canon of "Constitutional avoidance is an interpretive tool, counseling that ambiguous statutory language be construed to avoid serious constitutional doubts."

As applied here, Defendants application of the housing restrictions not only usurps

10

powers granted exclusively to the PRB, Defendants' policy also results in due process and equal protection violations. Paroled inmates cannot be denied release simply because they lack the funds to rent housing that satisfies Defendants' interpretation of the housing restrictions that are placed on sex offenders. See *Tate v. Short*, 401 U.S. 395, 397 (1971). When suitable housing exists and only a lack of funds prevents the parolee from securing that housing, denial of release on parole is not a function of the housing restriction per se, but rather it is a function of the parolee's indigency. See *Lubin v. Panish*, 415 U.S. 709, 39 L.Ed.2d 702 (1974) – applying same principle to candidate's filing fee; *James v. Strange*, 407 U.S. 128, 32 L.Ed.2d 600 (1972) – applying same principle to exemptions for judgment debtors.

Incarceration of indigents because they are financially unable to secure their release is an invidious discrimination that violates the Equal Protection Clause. *Williams v. Illinois*, 399 U.S. 235, 240-41, 26 L.Ed2d 586 (1970). Defendants' policy invidiously discriminates against the poor by denying release for those who cannot pay for approved housing. That the housing restrictions themselves apply to all inmates is of no consequence. A law that is "nondiscriminatory on its face may be grossly discriminatory in its operation." *Griffin v. Illinois*, 351 U.S. 12, 17, n. 11 (1956). Since only indigents will be detained beyond their parole release dates, Illinois has made release "contingent upon one's ability to pay... ." *Williams*, 399 U.S. at 242. In that respect, Defendants' policy violates the Equal Protection Clause by denying release to indigents.

Indigency also raises a due process issue. *Bearden*, 461 U.S. at 667-68. Viewed this way, the Court must consider: (1) the personal interest that is affected; (2) the extent to which that interest is adversely affected; (3) the rationality of the connection between the penalty that is

11

imposed and the legislative purpose; and (4) whether alternative means of effectuating the legislative purpose exist. *Williams*, 399 U.S., at 260; *Bearden*, 461 U.S. at 666-67. Each of these considerations is fact intensive and requires discovery before the "facts" are known. However, there is evidence that continued incarceration beyond the PRB ordered release date increases the likelihood of recidivism. See, Chicago Tribune, April 9, 2009, *Sex Offender Housing Restrictions May Lead To More Crime*.

If discovery proves that electronic monitoring or closer parole supervision are as effective as the housing restriction – without forcing indigent parolees to remain incarcerated for months or years beyond their parole release dates- then the need to strictly enforce a housing restriction on indigents is less compelling. *Id*. If it turns out that Defendants' housing restrictions are ineffectual and other forms of monitoring are as effective, but do not result in prolonged incarceration of indigents, then relaxing the housing restrictions is a constitutionally permissible alternative that must be considered. *Bearden*, 461 U.S. at 666-67. Because that determination is fact bound, the Court cannot resolve the issue now.

**DEFENDANTS CANNOT SUMMARILY RE-INCARCERATE PAROLEES BASED ON AN ALLEGED VIOLATION THAT WAS NEITHER FORESEEABLE NOR PREVENTABLE.**

Society has a vested interest in maintaining parole supervision and in continuing release on parole, absent a compelling reason to revoke parole. *Morrissey*, 408 U.S. at 484. Parolees are "released from prison based on an evaluation that [they show] reasonable promise of being able to return to society and function as a responsible, self-reliant person." *Morrissey*, 408 U.S. at 482. Once released, the process of re-integration begins and unnecessary interruptions of that process disserve the parolee and society. *Id*. The parolee "may have been on parole for a number of years and may be living a relatively normal life at the time he is faced with revocation." *Id*. By

12

then he may "be gainfully employed" and living "with family and friends," with whom he has formed the "enduring attachments of normal life." *Id*. The State, therefore, has no interest in revoking parole unless there is proof of a preventable parole violation. *Morrissey*, 408 U.S. at 483. As the *Morrissey* court noted, "Implicit in the system's concern with parole violations is the notion that the parolee is entitled to retain his liberty as long as he substantially abides by the conditions of parole." *Morrissey*, 408 U.S. at 479.

Defendants, however, unilaterally revoke parole for alleged violations that are neither foreseeable nor preventable. Plaintiff Murdock twice was released on parole and then returned to prison, even though he did nothing to warrant such punishment. The first time Murdock was reincarcerated followed several months of successful reintegration into society. (Doc. No. 57, at pp. 11-13). He was complying with all of the conditions of his parole when, without forewarning, a minor child took up residence at Murdock's PRB approved home site. (Id.). Murdock reported the change in circumstance, and he offered to find a new residence, but he needed a little time to locate one. Rather than allow him an opportunity to correct the problem and, without consulting the PRB, Murdock's parole agent summarily ordered Murdock returned to prison. That decision was made even though, "The officer directly involved in making recommendations cannot always have complete objectivity in evaluating them." *Morrissey,* 408 U.S. at 486.

After spending months in prison, Murdock was again approved for parole with electronic monitoring. This time Murdock was released to 12233 S. Sangamon, Chicago, Illinois. For twenty-two months Murdock remained on parole and resided at that location without incident. (Id.). A fire occurred at Murdock's host site. (Doc. No. 57, at p. 13). Although Murdock did not

13

cause the fire, he promptly reported the fire to his parole officer. The parole officer determined the host site was not habitable. (Id.). Murdock offered to move into another residence or a hotel to comply with conditions of his parole. (Id.). The parole officer charged Murdock with violating parole in that, through no fault of his own, Murdock's assigned host site became uninhabitable. (Id.).

Murdock was returned to prison twice, even though he had complied with all of the rules and regulations governing his release. Murdock did nothing wrong and there was nothing he could have done to prevent the change in circumstance that caused the parole agent to send him back to prison. The government cannot imprison a man who could neither foresee nor prevent the change in circumstance that led to the parole violation. *Morrissey*, 408 U.S. at 479. Therefore, Plaintiffs have stated a claim for relief.

## CONCLUSION

For all of these reasons, the Court should deny the Motion to Dismiss.

Respectfully Submitted,

S/ Thomas Peters
THOMAS PETERS, GIL SAPIR, KEVIN PETERS
ATTORNEYS FOR PLAINTIFF
407 S. Dearborn, Suite 1675
Chicago, IL 60605
(312) 697-0022