IN THE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JAMES V. MURDOCK, JR., TONYA HOEFKE, DONALD FULK, DEBRA RILEY, TRAVARES HUMPRHIRES, SHANE TAYLOR, GABRIEL ENGLAND, HOWARD HODGES, ALBINO MARTINEZ, SHERMAN JILTON, and DURELL SCOTT, JR., individually and on behalf of all others similarly situated, | ) ) ) ) ) ) ) ) | |
| *Plaintiffs,* | ) ) ) | |
| vs. | ) ) | |
| ROGER E. WALKER, Former Director of Illinois Department of Corrections, JESSE MONTGOMERY, Deputy Director of Parole Operations, MICHAEL RANDLE, Director of Illinois Department of Corrections, and JAMES REINHART, Chief of Staff Illinois Department of Corrections, in their individual and official capacities, | ) ) ) ) ) ) ) ) ) | No. 08 C 1142<br><br>**Honorable Blanche Manning,** Presiding |
| *Defendants.* | ) ) | |

## THIRD AMENDED COMPLAINT

## COUNT 1

Plaintiffs, James V. Murdock, Jr., Tonya Hoefke, Donald Fulk, Debra Riley, Tavares

Humphries, Shane Taylor, Gabriel England, Howard Hodges, Albino Martinez, Sherman Jilton,

and Durell Scott, Jr., on behalf of themselves and all other persons similarly situated, through

1

their attorneys, Thomas Peters, Gil Sapir, and Kevin Peters, state as follows:

## PARTIES, JURISDICTION AND VENUE

1. James Murdock, Jr. successfully completed his prison term on or about April 11, 2004, but he was then unlawfully imprisoned at the Stateville Correctional Center from April 11, 2005 until March 28, 2007, and again from January 18, 2008 to March 26, 2008. Murdock is currently on parole and electronic monitoring.

2. Plaintiff Tonya Hoefke successfully completed her prison term on May 8, 2006, but she was unlawfully imprisoned at Dwight Correctional Center from May 8, 2006 to March 23, 2007.

3. Plaintiff Donald Fulk successfully completed his prison term on July 13, 2005, but he was unlawfully imprisoned from July 13, 2005 to July 13, 2006.

4. Plaintiff Debra Riley successfully completed her prison term on March 14, 2006, but she was unlawfully imprisoned at Dwight Correctional Center from March 14, 2006 to October 5, 2006.

5. Plaintiff Tavares Humphries successfully completed his prison term on February 4, 2008, but he was imprisoned at Lawrence Correctional Center until long after that date. The IDOC has since released Mr. Humphries.

6. Plaintiff Shane Taylor successfully completed his prison term on September 1, 2007, but the IDOC unlawfully imprisoned him at Shawnee Correctional Center after the completion of his prison term. The IDOC has released Mr. Taylor.

7. Plaintiff Gabriel England successfully completed his prison term on October 3, 2007, but the IDOC unlawfully imprisoned him at Lawrence Correctional Center after the completion of his prison term. The IDOC has released Mr. England.

2

8. Plaintiff Howard Hodges successfully completed his prison term on or about June 26, 2008, but the IDOC unlawfully imprisoned him at Western Correctional Center after that date. The IDOC has released Mr. Hodges.

9. Plaintiff Albino Martinez successfully completed his prison term on June 14, 2010, but he has been unlawfully imprisoned at Logan Correctional Center since that date.

10. Plaintiff Sherman Jilton successfully completed his prison term on March 12, 2010, but he has been unlawfully imprisoned at Pinckneyville Correctional Center since that date.

11. Plaintiff Durell Scott, Jr. successfully completed his prison term on October 1, 2010, but he has been unlawfully imprisoned at Dixon Correctional Center since that date.

12. Each of these Plaintiffs was unlawfully detained in prison as a direct and proximate result of an unconstitutional policy and practice of the Defendants.

13. Defendant Walker was the Director of the Illinois Department of Corrections (hereafter "IDOC"). In that capacity, Walker set the policies and practices relating to Illinois parolees and, in particular, he established and enforced IDOC's guidelines with respect to the release of sex offenders. Walker is sued in his individual capacity for acts that he personally approved and ordered.

14. Defendant Michael Randle is the current Director of the IDOC. In that capacity, Randle sets the policies and practices relating to Illinois parolees and, in particular, he establishes and enforces IDOC's guidelines with respect to the release of sex offenders. Randle is sued only in his official capacity and Plaintiffs are not seeking damages as to Randle.

15. Defendant Montgomery is the Deputy Director of Parole for the IDOC. In that capacity, he implemented the policies and practices of Defendant Walker and currently

implements the policies and practices of Defendant Randle. Additionally, he trains other IDOC employees in accordance with those policies and practices. Montgomery is sued in his individual and official capacities.

16. Defendant James Reinhart is a duly authorized agent and employee of IDOC, and was the Chief of Staff for the IDOC during all times relevant to this action. Defendant Reinhart was acting in that capacity and under color of the laws of the State of Illinois during all times relevant to this action. He is sued in his individual and official capacities.

17. All of the acts and omissions alleged in this Amended Complaint were made while the Defendants were acting under color of state law.

18. This action is brought pursuant to 42 U.S.C. § 1983 for violations of Plaintiff's constitutional rights under the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution. The Court has jurisdiction based on 28 U.S.C. §§ 1331, 1343(a), and 2201. The Court has supplemental jurisdiction over the related state claims pursuant to 28 U.S.C. § 1367.

19. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to these claims occurred in this District and at least one of the Defendants resides in this District.

20. All of the Defendants maintain offices and do business in or near Chicago, Illinois, and the site for all of the preliminary parole revocation hearings is within this District.

### COMMON FACTS AND THE "TURNAROUND" POLICY

21. After an Illinois inmate has served his or her term of imprisonment, the inmate must be released from prison. The inmate remains under the jurisdiction of the IDOC during a fixed

4

period of mandatory supervised release, which is commonly referred to as "parole." *See* 730 ILCS 5/3-3-3(c); 730 ILCS 5/5-8-1(d).

22. By legislative mandate, the Prisoner Review Board (PRB) is the only entity with "the authority for setting conditions for . . . mandatory supervised release." 730 ILCS 5/3-3-1(a)(5). The IDOC has no such authority.

23. Parole agents employed by the IDOC, and working under the supervision of Defendants Montgomery and Reinhardt, are charged with supervising individuals on mandatory supervised release (hereafter "MSR"). If a parole agent believes a person serving on MSR has violated the terms of the MSR, the parole agent may charge the parolee with a violation.

24. The PRB is the only agency that is authorized by law to determine "whether a violation of those conditions warrant revocation of parole or mandatory supervised release or the imposition of other sanctions." 730 ILCS 5/3-3-1(a)(5). The IDOC has no such authority.

25. Parolees are entitled to hearings before the PRB to determine whether an alleged MSR violation has occurred. 730 ILCS 5/3-3-2(a)(5)(f). After the hearing, the PRB makes its determination. If an MSR violation has not occurred, then there is no lawful basis for keeping an individual in prison.

26. There is no provision under Illinois law that allows the IDOC, or any of the Defendants, to overrule a decision of the PRB to release an inmate to parole. Nor is there any provision under Illinois law that allows the IDOC, or any of the Defendants, to issue a parole violation before the parolee is even released from prison.

27. Nonetheless, on or about June 2005, Defendant Walker established a policy prohibiting the release of inmates convicted of sex offenses without his approval, regardless of

5

the PRB's determinations. That policy remains in full force and effect, and all of the Defendants, except Randle, have personally implemented and enforced that policy.

28. With the assistance of his Staff, including Defendants Reinhart and Montgomery, Defendant Walker, while he was the Director, developed, implemented, and enforced the "turnaround" policy described herein.

29. Before implementation of Defendants' "turnaround" policy, inmates classified as "sex offenders" were released on MSR either by order of the PRB following a parole release hearing for a C-number (indeterminate sentence) inmates or by statutory mandate upon completion of a determinate sentence.

30. Before being released, a "sex offender," whether serving an indeterminate or a determinate sentence, must submit a host site (proposed residence) and the PRB must approve his or her parole plans.

31. With respect to C-number inmates who have indeterminate sentences, the PRB conducts parole release hearings, usually annually, to decide when and under what circumstances the "sex offender" may be released.

32. Once the PRB orders the release on parole, the inmate has a protected liberty interest, which Defendants cannot unilaterally revoke or arbitrarily deny.

33. With respect to all other IDOC inmates, release is a statutory function of their determinate sentences. Most must serve half of their sentence and others must serve either 85% or 100% of their sentence.

34. As to non-C-number inmates, their release dates are determined by the sentences imposed and the statutory requirements that automatically attach to those sentences. Those

6

statutory requirements establish whether the inmate must serve 50%, 85% or 100% of the sentence (*i.e.,* an inmate with a 10 year sentence serving 50% is entitled to release after 5 years).

35. The PRB imposes conditions of release for inmates (non-C-numbers) who have statutorily mandated outdates. As to theses inmates, the PRB is the only agency authorized to deny release on parole and the only agency authorized to establish conditions of parole before release.

36. Nonetheless, in many cases, Defendants Walker and Montgomery refused to release a "sex offender" as ordered by the PRB, in accordance with the PRB's exclusive right to control the date and the conditions of release for all inmates.

37. Instead, Defendants Walker and Montgomery, acting through their agents and IDOC employees, inform parolees that a parole violation occurred, solely as a result of an alleged failure to have an "approved" home site.

38. As a result of Defendants' policy and practice, an inmate who is designated for release on parole by the PRB is charged with a parole violation before even leaving the prison. The alleged "violation" is based upon an alleged failure to have an approved host site, despite the fact that the PRB has already approved release to a site.

39. In most cases, the paroled inmate is literally walked to the front gate, as if he or she was about to be released, and then handed a notice of the alleged host site violation. Because these parolees are turned around at the prison gate before getting outside of the prison, this practice is commonly known as IDOC's "turnaround" policy.

40. After being charged with the alleged parole violation, the parolee is placed in punitive segregation and often is transferred to another prison. As a result, the paroled inmate is

7

denied access to family and to legal counsel, and he is held under punitive conditions that are significantly harsher than inmates who are in general population status.

41. Failure to have an "approved" home site is not an MSR violation, when the PRB has approved release to a site. Nevertheless, Defendants Walker and Montgomery refused to release hundreds of lawfully paroled inmates, thereby depriving those inmates of their liberty without due process and equal protection of law.

42. As a result, individuals who successfully completed their prison terms have spent, and are spending, up to three years in prison after their lawful release dates.

43. All of the Defendants are aware of this "turnaround" practice and have knowingly caused, or allowed, hundreds of eligible parolees to remain in the IDOC solely on the unfounded allegation that the parolee did not have an approved host site.

44. None of the Defendants provide the "paroled" inmate with meaningful advance notice that the host site, as approved by the PRB, was rejected by the IDOC. Nor do any of the Defendants provide inmates with the opportunity or the means to correct any perceived deficiency in the host site.

45. In most cases, the host site is a family member or friend of the parolee because the parolee does not have sufficient funds to either: a) locate independent living sites, or b) rent an apartment independent of family or friends. Lack of funds is by far the most common reason paroled inmates are not able to secure an IDOC-approved host site.

46. After an inmate who was scheduled for release by the PRB is denied release by the IDOC, a parole revocation hearing is conducted. When these "turnaround" parolees finally appear before the PRB, the PRB finds the parolee did not violate their MSR terms. The parolee is

8

again scheduled by the PRB for release and the "turnaround" cycle resumes.

47. Defendants Walker and Montgomery again deny release and re-file another alleged host site violation, even though the PRB has already heard and denied the same unfounded allegation. Nonetheless, based on the new charge, the parolee is again placed in punitive segregation and usually transferred to a new facility where the whole process begins anew.

48. As a result, the paroled inmate is denied his constitutional right to release as approved by the PRB, and the IDOC incurs substantial, unnecessary costs for the continued incarceration of the paroled inmates. The cost of re-incarceration substantially exceeds the cost of parole supervision so the "turnaround" policy is not only unconstitutional, but it also is a financial drain on an already overburdened system.

49. Defendants Walker and Montgomery know their "turnaround" policy deliberately contravenes Illinois law, which clearly and unambiguously mandates that the PRB is the only agency allowed to authorize release on parole, to conduct parole hearings, and to determine whether a parole violation has occurred.

50. Defendants Walker and Montgomery know that their "turnaround" policy contravenes the PRB's clearly established statutory authority to set conditions for MSR and to make the final determination regarding a violation of those conditions occurred.

51. Defendants' statewide disregard for the PRB's determinations is intentional and deprives Plaintiffs of their right to due process and equal protection of law.

52. Defendants' deliberate indifference to the PRB's authority and to Plaintiffs' due process and equal protection rights is so arbitrary that it shocks the conscience, and Defendants' policy contravenes the Illinois statutes governing release on parole and revocation of parole.

### James V. Murdock, Jr.

53. In January 1967, James Murdock, Jr. was convicted of deviate sexual assault and sentenced to a term of 40 to 120 years. He was assigned a C-number and became eligible for release on parole after serving approximately twelve years in prison.

54. After serving 29 years, Murdock was paroled by order of the PRB on or about April 12, 2004 to an approved location.

55. Murdock's release was conditioned on home confinement, electronic monitoring, weekly sex counseling, and participation in educational programs for sex offenders.

56. Following his release on parole, Murdock was assigned a parole agent in Cook County, and he complied with all of the conditions of his parole for the next year.

57. On or about April 11, 2005, Murdock was returned to the custody of the IDOC because his granddaughter moved into the host site where Murdock resided. Murdock did not have advance notice that his granddaughter would be moving to the host site, and he did not have time to arrange for a new host site.

58. Murdock was charged by his parole agent with violating his parole in that Murdock no longer had an approved host site. The violation did not allege that Murdock planned the violation or played any role in the violation. Murdock was taken into custody, transported to an IDOC facility, and placed in punitive segregation.

59. Murdock was not provided an opportunity to secure a different host site, when his granddaughter moved into Murdock's previously approved host site.

60. Murdock could have located and rented an acceptable host site, but he lacked sufficient financial resources to find one on such short notice. Also, the IDOC did not provide

10

him with a reasonable opportunity to locate new housing.

61. On or about May 10, 2005, the PRB determined that Murdock had not violated his parole because a) he did not intentionally or even negligently violate the host site provision of his release terms, and b) he was at all times willing to live at another, suitable host site.

62. Following the PRB's decision, Murdock was walked to the front gate of the IDOC facility where he was being held. When he reached the front gate of the IDOC facility, he was charged with the same parole violation—not having a suitable host site—and again placed in segregation.

63. After several days, Murdock was released from segregation and another parole revocation hearing was scheduled.

64. When Murdock next received his parole revocation hearing, the PRB again found "no violation" and again ordered his release.

65. Defendants Walker, Reinhart, and Montgomery nonetheless refused to release Murdock, and instead Murdock was charged with the same host site violation that the PRB had already rejected.

66. This scenario was repeated on each of the following dates: (1) June 1, 2005; (2) June 29, 2005; (3) August 25, 2005; (4) October 28, 2005; (5) November 22, 2005; and (6) July 25, 2006.

67. As a result of Defendants' (Walker, Reinhart, and Montgomery) policy and practice, Murdock remained in custody from April 11, 2005 until March 28, 2007, even though the PRB ordered his release on numerous occasions.

68. On or about March 28, 2007, the PRB again approved Murdock for parole with

11

electronic monitoring. This time Murdock was released to 12233 S. Sangamon in Chicago.

69. From March 28, 2007 until January 26, 2008, Murdock remained on parole and resided at that location without incident. Murdock complied with all of the conditions of his parole, and he adjusted well to living on his own in Chicago.

70. On or about January 26, 2008, a fire occurred at Murdock's host site. Although Murdock did not cause the fire, he promptly reported the fire to his parole officer.

71. The parole officer determined the host site was not habitable. Murdock offered to move into another residence or a hotel to comply with conditions of his parole.

72. The parole officer, without inspecting those locations, alleged that alternative host sites were not acceptable so the agent took Murdock into custody on or about January 26, 2008. Murdock was charged with violating his parole in that, through no fault of his own, the assigned host site became uninhabitable.

73. After Murdock was returned to the IDOC, a parole revocation hearing was held by the PRB, which again found that Murdock had not violated the terms of his parole and ordered his release.

74. After serving approximately two more months in prison, on March 26, 2008, Murdock was released from Stateville by the IDOC to live at 12531 S. Ashland in Chicago.

**Tonya Hoefke**

75. In 2001, Plaintiff Tonya Hoefke, at age 17, was convicted of a misdemeanor sex offense and sentenced to probation, but nonetheless required to register as a sex offender.

76. On September 28, 2005, Ms. Hoefke was arrested for burglary and for failure to register as a sex offender. She was convicted of those charges and was sent to Dwight

12

Correctional Center with a release date of May 8, 2006.

77. On that date, the IDOC alleged that Ms. Hoefke violated the terms of her MSR by not having an IDOC-approved host site, and she was turned around at the gate. IDOC did not "approve" the proposed site because Ms. Hoefke's own children lived there.

78. On August 3, 2005, Ms. Hoefke appeared before the PRB. She was found not to be a violator, and the PRB ordered her immediate release from prison.

79. The IDOC, acting in accordance with the Defendants' policy and practice, again turned her around at the prison gate. IDOC staff, acting pursuant to Defendants' policy, determined Ms. Hoefke violated her MSR because IDOC personnel had not approved her proposed address. Even those Defendants and their representatives, however, knew that their unwillingness to "approve" Hoefke's home site was not an MSR violation, as previously determined by the PRB.

80. There were other sites in close proximity to Ms. Hoefke's proposed site. However, those other sites cost more to rent, and Ms. Hoefke could not afford them. As a result, Ms. Hoefke remained unlawfully imprisoned at Dwight Correctional Center until the expiration of her MSR term on March 23, 2007.

### Donald Fulk

81. In 2001, Plaintiff Donald Fulk, at age 17, was convicted of misdemeanor criminal sexual abuse stemming from a consensual relationship he had with a 16 year-old girlfriend. He was required to register as a sex offender.

82. On February 11, 2004, Mr. Fulk was convicted of an unrelated offense, and he was sent to Jacksonville Correctional Center. His release date was July 13, 2005. He was to be

13

released to a halfway house, but the site was denied for lack of space two days before Mr. Fulk
was scheduled for release.

83. IDOC staff, acting in accordance with Defendants' policy and practice, determined
that Mr. Fulk had violated the terms of his MSR so he was turned around at the gate. On August
30, 2005, Mr. Fulk appeared before the PRB, and the PRB determined that he was not a violator,
ordering Fulk released from prison.

84. IDOC staff again turned him around at the prison gate for the same alleged host site
violation because the IDOC "had no success in finding a suitable host site."

85. Mr. Fulk did not have sufficient funds to rent a suitable host site and was denied
release solely because he lacked sufficient funds to rent a suitable apartment. There were suitable
locations in the vicinity of Mr. Fulk's designated release site, and only his lack of funds
prevented him from renting at one of those locations.

86. Mr. Fulk remained unlawfully imprisoned in various IDOC facilities until the
expiration of his MSR term on July 13, 2006.

87. Mr. Fulk's continued incarceration throughout that time was caused by Defendants'
"turnaround" policy.

### Debra Riley

88. In 1994, Plaintiff Debra Riley was convicted of aggravated criminal sexual assault
for failing to report her husband's crimes against a child.

89. Her statutory release date was March 24, 2006. On that date, Ms. Riley was informed
by IDOC personnel, acting pursuant to Defendants' "turnaround" policy, that she had violated the
terms of her MSR and she was turned around at the gate.

14

90. IDOC staff did not "approve" her parents' home address in Orland Park, Illinois because it allegedly was "too close" in proximity to a park. Ms. Riley had no prior notice of the alleged problem with the proposed host site, and she could have corrected the problem by finding another location if she had she been given notice of the alleged problem.

91. On August 3, 2006, Ms. Riley appeared before the PRB. She was found not to be a violator, and the PRB ordered her released from prison.

92. IDOC staff again turned her around at the prison gate because IDOC staff, acting in accordance with Defendants' policy and practice, still had not approved her proposed address even though IDOC personnel knew its failure to "approve" her address was not an MSR violation as lawfully determined by the PRB.

93. Debra Riley remained unlawfully imprisoned at Dwight Correctional Center until October 5, 2006 as a result of Defendants' unconstitutional policy and practice.

**Tavares Humphries**

94. As a minor, Tavares Humphries was convicted of a misdemeanor sex offense. Because of this juvenile offense, Mr. Humphries is required to register as a sex offender.

95. In 2006, after being released from prison on an adult, drug-related charge, Mr. Humphries was charged with not properly registering as a sex offender, and he received a one year sentence.

96. With "good time," Mr. Humphries should have been released in 60 days. He was turned around, however, for failure to have an approved address, and he was not released from prison until his maximum MSR period was completed in early 2007.

97. Following that release, Mr. Humphries was re-incarcerated for an unrelated charge.

On February 4, 2008, Mr. Humphries was scheduled for release on MSR for this offense.

98. On that day, Mr. Humphries was informed by IDOC personnel that he had violated the terms of his MSR and was turned around at the gate. The IDOC did not "approve" any of Mr. Humprhies' host sites for electronic monitoring even though those host sites were not in violation of the PRB's orders.

99. Mr. Humphries was not given advance notice of the alleged host site violations and he could have corrected the alleged violations if he had received timely notice of the violation.

### Shane Taylor

100. On August 10, 1999, at age 13, Shane Taylor pled guilty to a juvenile charge of criminal sexual abuse. Because of his plea, Mr. Taylor was required to register as a sex offender for ten years.

101. In 2005, Mr. Taylor was convicted of a non-sexual offense. He was scheduled for release on MSR on September 1, 2007. On that date, the IDOC informed Mr. Taylor that he had violated the terms of his MSR and was turned around at the gate because the IDOC did not "approve" Mr. Taylor's host sites for electronic monitoring.

102. On October 23, 2007 and December 12, 2007, Mr. Taylor appeared before the PRB, which ordered Mr. Taylor released as no violation had occurred. Mr. Taylor remained unlawfully imprisoned even though the PRB had found that he did not violate the terms of his release. The IDOC has since released Mr. Taylor.

### Gabriel England

103. On or about June 3, 2004, Gabriel England was found guilty of aggravated sexual abuse and sentenced to six (6) years in IDOC custody. On October 3, 2007, Mr. England

16

completed his determinate sentence.

104. On that date, IDOC personnel told Mr. England that he had violated the terms of his MSR, and he was turned around at the gate. Mr. England was violated because IDOC staff did not "approve" a host site for electronic monitoring.

105. On December 10, 2007, Mr. England appeared before the PRB and he was found not to be in violation of the terms of his MSR. The PRB ordered that he was to be released the next day.

106. On December 11, 2007, the IDOC turned around Mr. England at the gate for an alleged violation of the terms of his MSR because IDOC personnel had not approved his proposed address. Mr. England remained unlawfully imprisoned despite the fact that the PRB had found that he was not in violation of the terms of his MSR. The IDOC has since released Mr. England.

## Howard Hodges

107. In December 1996, Howard Hodges was convicted of aggravated sexual assault with a weapon. In January 2004, Mr. Hodges was convicted of narcotics offenses and he was sentenced to three (3) years in the IDOC.

108. In November 2007, Mr. Hodges was paroled to 8711 Cottage Grove in Chicago. On March 28, 2008, he was returned to the IDOC for an alleged failure to register, but he was later released.

109. His new release date was June 26, 2008, and approximately two months before that he submitted a parole plan that included a residence in Park Forest, Illinois.

110. On or about June 26, 2008, IDOC staff, acting in accordance with Defendants'

policy and practice, charged Mr. Hodges with a parole violation for an alleged host site violation, even though the IDOC had not checked the proposed residence. Hodges was residing at a PRB approved location.

111. Mr. Hodges was not given reasonable notice of the alleged violation nor was he given an opportunity to correct the alleged violation. He remained unlawfully imprisoned at the Western Illinois Correctional facility after June 2008 even though he was living at a suitable location and under the conditions of his release as determined by the PRB. The IDOC has since released Mr. Hodges.

**Albino Martinez**

112. Mr. Martinez was convicted of murder and aggravated sexual assault and he was sentenced to thirty (30) years; twenty-four (24) years for the murder and six (6) for the sexual assault.

113. He was received in custody of the IDOC on or about September 14, 1995, and his first projected parole release date was June 14, 2010.

114. Mr. Martinez was paroled on that date, but he was not allowed to leave Logan Correctional Center, the institution where he is incarcerated. Instead, he was turned around and held as an alleged parole violator. The alleged violation was that Mr. Martinez did not have housing that was suitable to the Defendants herein despite the fact that he submitted four residences in Chicago and Cicero as proposed release locations.

115. Mr. Martinez continues to be unlawfully incarcerated at the Logan Correctional Center in violation of his rights to due process and equal protection of law. Mr. Martinez is indigent and could not afford housing that was suitable to the Defendants. But for his indigency Mr. Martinez would have been released by now.

**Sherman Jilton**

116. Mr. Jilton was convicted of armed violence with a category I weapon and aggravated unlawful restraint and he was sentenced to fifteen (15) years; ten (10) years for the armed violence and five (5) years for the aggravated unlawful restraint.

117. He was received in custody of the IDOC on or about December 14, 2005, and his first projected parole release date was June 11, 2010.

118. On March 12, 2010, Mr. Jilton received an order from the PRB requiring him to be placed on electronic monitoring, as well as other conditions. Mr. Jilton was subsequently informed that because of the electronic monitoring condition of his release, he would not be eligible for placement in a halfway house. Mr. Jilton had, in fact, contacted Field Services more than a year before this situation arose asking for help with housing placement. Mr. Jilton even wrote numerous halfway houses inquiring into whether he could be assessed for placement therein. On April 8, 2010, the IDOC rejected Jilton's placement in a halfway house.

119. On June 11, 2010, the IDOC found Mr. Jilton to be in violation of the terms of his MSR as an alleged parole violator. Mr. Jilton was turned around and was not allowed to leave Pinckneyville Correctional Center, the institution where he is incarcerated. The alleged violation was that Mr. Jilton did not have housing that was suitable to the Defendants herein.

120. On July 15, 2010, Mr. Jilton received a parole violation report. The IDOC asked Mr. Jilton to sign the report and to initial the waiver to Mr. Jilton's preliminary hearing. Mr. Jilton refused to initial the waiver, informing the IDOC that he was entitled to this hearing within ten days of the alleged violation.

121. On July 29, 2010, Mr. Jilton spoke with the PRB to complain about the

19

unconstitutional procedures regarding the parole and release of sex offenders in Illinois.

122. Mr. Jilton continues to be unlawfully incarcerated at Pinckneyville Correctional Center in violation of his rights to due process and equal protection of law. Mr. Jilton is indigent and could not afford housing that was suitable to the Defendants. But for his indigency Mr. Jilton would have been released by now.

### Durell Scott, Jr.

123. Mr. Scott was convicted of attempted criminal sexual assault and he was sentenced to three (3) years in prison.

124. He was received in custody of the IDOC on or about April 2, 2009, and his first projected parole release date was October 1, 2010.

125. On October 1, 2010, the IDOC turned around Mr. Scott and he was not allowed to leave the Dixon Correctional Center, where he is currently incarcerated.

126. The IDOC informed Mr. Scott that he had allegedly violated the terms of his MSR due to all of his proposed home sites being denied.

127. Mr. Scott remains unlawfully incarcerated in violation of his rights to due process and equal protection of law. This violation of Mr. Scott's constitutional rights is a direct and proximate result of the IDOC's "turnaround" policy and practice.

128. Mr. Scott is indigent and could not afford housing that was suitable to the Defendants. If Mr. Scott was wealthy enough to afford "suitable" housing, he would have been released by now.

129. Defendants' "turnaround" policy violates Plaintiffs' constitutional rights by depriving them of their liberty without due process or equal protection of law. Defendants'

flagrant, knowing, and deliberate disregard of Plaintiffs' due process and equal protection rights
is so arbitrary and oppressive that it shocks the conscience.

Wherefore, Plaintiffs respectfully request the Court will:

(a) enter preliminary and permanent injunctions prohibiting enforcement of Defendants'
"turnaround" policy;

(b) declare that Defendants' "turnaround" policy violates the Due Process and the Equal
Protection Clauses of the United States Constitution; and

(c) award damages, costs, and reasonable attorneys' fees to Plaintiffs.

## COUNT II

## CLASS ACTION ALLEGATIONS

1-129. Plaintiffs re-allege paragraphs 1 to 129 of Count I as paragraphs 1 to 129 of
Count II.

130. Plaintiffs bring this Count as a class action pursuant to Federal Rule of Civil
Procedure 23(b)(2) and (3), on behalf of all similarly situated individuals who have been turned
around by IDOC and thereby denied their rights to due process and equal protection of law.

### The Injunctive Relief Class

131. The Injunctive Relief Class consists of individuals currently imprisoned by the
IDOC, who were turned around by the IDOC as MSR violators, then determined by the PRB not
to be MSR violators.

132. The members of the Injunctive Relief Class are so numerous that joinder of all
members is impracticable:

A) IDOC has been implementing its "turnaround" policy for over two years;

B) There are hundreds of members in the Injunctive Relief Class; and

21

C) The number of Injunctive Relief Class members will increase since the IDOC continues to implement its "turnaround" policy, thereby depriving additional class members of their liberty interest without due process and equal protection of law.

133. Common issues of law and fact exist as to all members of the Injunctive Relief Class and predominate over any questions solely affecting individual members. Among these questions are:

A) whether Illinois law creates a liberty interest protected by due process of the law under the Fourteenth Amendment of the United States Constitution;

B) whether Defendants' refusal to let the Injunctive Relief Class members out of prison, after the PRB determines that they are not violators of their MSR terms, deprives the Injunctive Relief Class of their liberty without due process of the law and in violation of the Fourteenth Amendment of the Constitution;

C) whether Defendants' refusal to let the Injunctive Relief Class members out of prison, after the PRB determines that they are not violators of their MSR terms, deprives the Injunctive Relief Class of equal protection of law in violation of the Fourteenth Amendment of the Constitution; and

D) whether members of the Injunctive Relief Class are entitled to injunctive or declaratory relief.

134. The claims of the named class representatives are typical of the claims of all the Injunctive Relief Class members, since all Injunctive Relief Class members are similarly affected by Defendants' actions.

135. Plaintiffs will fairly and adequately protect the interests of the Injunctive Relief

22

Class and have retained counsel, who are competent and experienced in class action and civil

rights litigation. There are no conflicts of interest among the Injunctive Relief Class, as all

members seek similar forms of relief.

## The Damages Class

136. The proposed Damages Class consists of individuals formerly imprisoned by the

IDOC, who were turned around by IDOC personnel as MSR violators, found by the PRB not to

be MSR violators, but are now released.

137. The members of the Damages Class are so numerous that joinder of all members is

impracticable since:

> A) IDOC has been implementing its "turnaround" policy for over two years;

> B) There are hundreds of members in the Damages Class; and

> C) The number of Damages Class members will increase as the IDOC continues

to implement its "turnaround" policy, thereby depriving additional class members of their liberty

interest without due process and equal protection of law. Plaintiffs will be able to ascertain the

exact number of Damages Class members through appropriate discovery.

138. Common issues of law and fact exist as to all members of the Damages Class and

predominate over any questions solely affecting individual members. Among these questions are:

> A) whether Illinois law creates a liberty interest protected by due process of the

law under the Fourteenth Amendment of the United States Constitution;

> B) whether Defendants' refusal to let the Damage Class members out of prison,

after the PRB determines they are not violators of their MSR terms, deprived the Damages Class

of their liberty without due process of the law and in violation of the Fourteenth Amendment of

23

the Constitution;

C) whether Defendants' refusal to let the Damages Class members out of prison, after the PRB determines that they are not violators of their MSR terms, deprives the Damages Class of equal protection of law in violation of the Fourteenth Amendment of the Constitution; and

D) whether members of the Damages Class are entitled to damages.

139. The named class representatives' claims are typical of the claims of all Damages Class members since all Damages Class members are similarly affected by Defendants' actions.

140. Plaintiffs will fairly and adequately protect the interests of the Damages Class and have retained counsel competent and experienced in class action and civil rights litigation. There are no conflicts of interest among the Damages Class, as all members seek similar forms of relief.

141. A class action is the superior method for adjudication of this controversy in terms of both fairness and judicial economy. Because the two proposed classes are so numerous that joinder of all members is impracticable, common issues of law and fact predominate among the classes, and members of the respective classes seek similar forms of relief, adjudication of this controversy as a class action serves fairness and efficiency.

WHEREFORE, Plaintiffs respectfully request this Honorable Court find in their favor and against Defendants on all claims and award the following relief:

A) Equitable relief for the Injunctive Relief Class, including:

1) a declaratory judgment that Defendants are depriving Injunctive Relief Class members of their liberty in violation of the Fourteenth Amendment of the U.S. Constitution; and

24

2) a preliminary and permanent injunction directing Defendants to comply with all PRB findings related to MSR decisions;

B) Compensatory damages, costs, and reasonable attorneys' fees for Damages Class members for their unlawful imprisonment by the IDOC and for the emotional distress caused by Defendants' unconstitutional policy and practice;

C) Punitive damages for Damages Class members to sanction Defendants' deliberate, knowing, and systematic misconduct to deter Defendants and others from similar actions in the future;

D) Any other relief which this Court may deem necessary, just and proper; and

E) Reasonable attorneys' fees and costs.

Respectfully Submitted,

s/ Thomas Peters
THOMAS PETERS, GIL SAPIR, KEVIN PETERS
ATTORNEYS FOR PLAINTIFF
53 W. Jackson Blvd., Suite 1615
Chicago, IL 60604
(312) 697-0022