| | | |
|---|---|---|
| JAMES V. MURDOCK, JR., et. al, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 08 C 1142 |
| | ) | |
| v. | ) | |
| | ) | Judge Thomas M. Durkin |
| ROGER E. WALKER, et. al, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This class action suit involves past, current, and future Illinois sex-offender inmates who were (or will be) approved for release from prison, either on parole or under Mandatory Supervised Release ("MSR"). The Plaintiffs were not (or will not be) actually released from prison on their release date, however, because they lack an approved housing location. They claim the Defendants, current and past employees of the Illinois Department of Corrections ("IDOC"), violated their due process and equal protection rights and continue to do so as a result of this practice. R. 107. The Defendants filed a motion for summary judgment, contending that the Plaintiffs cannot establish a constitutional violation or, alternatively, that they are entitled to qualified immunity. R. 219. In response, the Plaintiffs filed their own cross-motions for partial summary judgment on behalf of the named Plaintiffs, as

well as the certified class.[1] R. 223, R. 226.[2] For the following reasons, the Defendants' motion is granted, the Plaintiffs' motions are denied, and the case is dismissed.

## BACKGROUND

### I.   The Illinois Parole/Mandatory Supervised Release Framework

The State of Illinois allows the release of inmates from prison on MSR or parole (collectively referred to as "parole")[3] before the end of their criminal sentences. *See People ex rel. Abner v. Kinney*, 195 N.E.2d 651, 653 (Ill. 1964) ("Parole does not end or in any way affect the prisoner's sentence but is a correctional device authorizing service of the sentence outside the penitentiary."). The purpose of this release "is to help individuals reintegrate into society as constructive individuals as soon as they are able, without being confined for the full

---

[1] The Plaintiffs' motion for class certification was granted on June 7, 2011. R. 137. The class is defined as: "Illinois Department of Corrections prisoners who (1) have been, or will be, convicted of a sex offense; (2) have served the maximum term of imprisonment for their sentence; (3) have been authorized for release to mandatory supervised release (parole) by the Illinois Prisoner Review Board; (4) were, or will be, denied release by the Defendants because the class member's approved housing site, as determined by the Prisoner Review Board, was disapproved by one or more of the Defendants; and (5) as a result of Defendants' conduct the class member was not released." R. 137 at 3.

[2] The Plaintiffs' memorandum of law in support of each motion is essentially the same, the only difference being the relief requested. *Compare* R. 224, *with* R. 227.

[3] To be clear, there is a difference under Illinois law between prisoners who are to serve MSR and those who are to be released on parole. *See People v. Lee*, 979 N.E.2d 992, 1000-01 (Ill. App. Ct. 4th Dist. 2012) (providing a brief description of the difference between "parole" and "MSR"). However, for purposes of this case, the difference does not matter. For each type of release, the IDOC precludes the person from actually being released because he lacks an approved housing location. For clarity and consistency, the Court refers to either basis for release from prison as "parole."

term of the sentence imposed. It also serves to alleviate the costs to society of keeping an individual in prison." *Morrissey v. Brewer*, 408 U.S. 471, 477 (1972). The prisoner may remain on parole, and out of prison, until the end of his sentence provided he abides by all the conditions of his release. These conditions restrict the prisoner's daily activities well beyond the normal limitations imposed by law on an ordinary individual citizen. In Illinois, the conditions may include residency restrictions (as discussed further below), attending mandatory treatment or counseling sessions, and frequently reporting to a representative of the IDOC. *See* 730 ILCS 5/3-3-7 *amended by* Public Act 98-558, effective Jan. 1, 2014. Prisoners convicted of an offense which qualifies them as a sex offender under 730 ILCS 150/1 *et seq.,* on or after January 1, 2007, have additional restrictions; they are required to wear an electronic monitoring device, as defined in 730 ILCS 5/5-8A-2, for the duration of their "parole, mandatory supervised release term, or extended mandatory supervised release term." *See* 730 ILCS 5/3-3-7(a)(7.7). Those convicted of a more serious sexual offense on or after August 11, 2009, are required to wear an approved electronic monitoring device that has Global Positioning System ("GPS") capability during the release term. *Id.*

The Illinois legislature has established the framework under which an inmate's parole release is determined. The Prison Review Board ("PRB") is responsible for establishing release dates from prison for parolees, setting the conditions for parole release, and determining whether a violation of a condition should result in a revocation of one's parole. 730 ILCS 5/3-3-1. The IDOC retains

custody of all prisoners released on parole and is charged with supervising those persons during their release "in accord with the conditions set by the [PRB]." 730 ILCS 5/3-14-2. The IDOC is independent of the PRB, though it is required to assist eligible prisoners and report its "efforts and findings" to the PRB so that the PRB may consider the information in its release decisions. 730 ILCS 5/3-3-1, 5/3-14-2.

As a prisoner's projected release date approaches, the prisoner prepares and submits a release plan to the PRB. R. 233 ¶ 6. The PRB then conducts an inquiry into whether a given prisoner is entitled to be released on parole. R. 233 ¶ 6. In doing so, the PRB is tasked with setting conditions for any release on parole under 730 ILCS 5/5-8-1. *See Lucas v. Prisoner Review Bd.*, 999 N.E.2d 365, 371 (Ill. App. Ct. 2d Dist. 2013) (citing 730 ILCS 5/3-3-1(a)(5), 3-3-2(a)(3)); R. 233 ¶ 5. If the PRB determines that a prisoner is entitled to release, the PRB issues a release order that includes a specific date for release, R. 228-3 at 43:6-23; R. 233 ¶ 8; which is usually at least 30 days from the date of the release order. R. 236-4 at 77:22-78:2. Nevertheless, despite a future "release date," the parties agree that under Illinois law, "[t]he PRB's decision to release an inmate on parole makes him a parolee, even though he is still in prison" until his actual release date. R. 233 ¶ 12. The PRB's release order is to be delivered to the parolee within 7 days of its entry. 20 Ill. Admin. Code § 1610.60. The order generally does not include a place of residence for the prisoner. R. 228-3 at 14:6-9.

Once a prisoner has been given a release order, the IDOC becomes responsible for monitoring an inmate's release and subsequent compliance with any

conditions set by the PRB or as required by Illinois statute. R. 247 ¶¶ 15-16. The IDOC has different responsibilities regarding an inmate's release, including (1) preparing the individual for parole (this is mainly done through the field services representative or the inmate's counselor); (2) reviewing the rules and conditions of parole with the parolee; and (3) conducting an overall review of the conditions imposed by the PRB. R. 233 ¶ 16. Generally, IDOC receives a given inmate's release order about five months before a prisoner's release date, though it could be as far out as one year or as little as the day of release. R. 228-3 at 24:4-14. In addition, the prisoner gives his counselor or an IDOC institutional field services representative his full release plan, which includes an intended place of residence, also known as a "host site." R. 228-3 at 15. A parolee must have an approved host site to be released on parole; otherwise, he will remain in custody. R. 236-7. The information is then entered into the computer system. R. 228-3 at 15.

Once the information is entered into the computer, an IDOC representative investigates whether the prisoner's proposed host site is a proper housing location. R. 228-3 at 16:3-12. The representative is required to inspect the location to make sure that, in the case of sex offender parolees, there are no children living at the location, the site has sufficient resources (e.g., functioning heat, running water, and working bathroom facilities), and the location is not within 500 feet of certain areas—churches, parks, and schools—among other things. R. 228-3 at 25:6-26:24. Another important consideration is the fact that prisoners convicted of sexual offenses have "electronic monitoring" as a release condition, 730 ILCS 5/3-3-7(b-1),

so for them, the host site must have a working land telephone line. R. 228-6 at 16:23-17:9; R. 236-4 at 76:21-77:21. Then, based on all of these considerations, the representative can either approve or deny a proposed host site. R. 228-3 at 34:3-35:4.

If the parolees' location is approved, he is released on the date listed on his release order. R. 228-6 at 17:10-24. If the host site is found to be inadequate but a person living at the location can rectify the deficiencies, that person is notified of the correctable issues. R. 228-6 at 18:1-19:3. If the deficiencies cannot be cured, the representative inputs his negative findings into the computer system, and the prisoner is notified that he will not be released from custody until he finds another place to live. R. 228-3 at 42:24-44:23. This is where the case at hand finds its roots.

## II. The Turnaround Practice

The named Plaintiffs are current and former prisoners who were incarcerated, or formerly incarcerated, within the IDOC. R. 236 ¶ 2. Each of them at some point was convicted of a "sexual offense," as defined under Illinois law, and given a prison sentence as a result. R. 236 ¶ 5. Each of them is or has been subject to the same statutory and regulatory scheme described above regarding parole. What distinguishes the named Plaintiffs from other individuals convicted of a sexual offense who were approved for release and actually released is the PRB

approved all the named Plaintiffs for release, but none of them were actually released because they lacked an appropriate host site.[4]

When the release date arrived for the named Plaintiffs, IDOC had already determined that their host sites were deficient in some regard. So instead of actually releasing the Plaintiffs from custody, someone at the jail literally would walk the person to the front gate of the jail as if he was about to be released. R. 233 ¶ 19. But then, instead of releasing the inmate, the jail employee handed the inmate a notice informing him that he had violated the housing requirement of his release. R. 233 ¶¶ 19-20. The Plaintiffs allege, and offer support through their own affidavits,[5] that they were then taken back into custody and "placed into segregation for a substantial amount of time and/or subsequently returned to the general prison population." R. 233 ¶ 21-22.[6] The uncontroverted testimony is that inmates without a valid host site, as monitored and enforced by the IDOC, were not

---

[4] Murdock was originally released on parole to an appropriate host site, but he was later taken back into custody after his granddaughter moved into the residence. R. 233 ¶¶ 34-35. He then became subject to the practice described here.

[5] The Defendants object to numerous statements in their response to the "Plaintiffs' Local Rule 56.1 Statement of Uncontested Facts," contending that the "statement[s] [are] based only on Plaintiff's self-serving affidavit without factual support in the record." *See, e.g.*, R. 233 ¶ 35 (citing *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001)). This objection is without merit as the line of cases suggesting that so called "self-serving affidavits" are not admissible in motion for summary judgment proceedings was explicitly overruled in *Hill v. Tangherlini*, 724 F.3d 965, 968 n.1 (7th Cir. 2013).

[6] Defendant Randle testified that this was the practice under Defendant Walker but explained that it was simply a "paper process" during his time as director. R. 236-3 at 20:1-6. In other words, parolees are no longer walked to the gate and then brought back into custody; now, they just remain in the jail as if the release date was never ordered. R. 228-6 at 22:5-23:14.

released even if they had a valid parole order. R. 245 ¶ 17. The Defendants deny that there was a systematic practice of parolees being put into segregation as a result of the host site violation. R. 233 ¶ 22. In any event, the practice of not releasing the inmate and bringing him back to the jail became known as the "turnaround practice."

Once IDOC entered a possible parole violation into the system and the parolee remained in jail or was retaken into custody, the parolee was entitled to a preliminary parole revocation hearing within 10 days unless that hearing was waived. R. 236-7. Whether the named Plaintiffs in this case received (or waived) their preliminary hearing is an immaterial issue, as discussed further below. Nonetheless, at some point, the Plaintiffs were entitled to a full revocation hearing with the PRB. *See* 730 ILCS 5/3-3-1. The Plaintiffs all received that hearing, and as is particularly relevant here, the PRB determined each time that the Plaintiffs should not have their parole revoked as a result of the alleged host site violation. *E.g.*, R. 233 ¶ 37.

Following that first full parole revocation hearing with the PRB, the Plaintiffs were given a new release date. However, because the Plaintiffs were unable to rectify the original problem of not having suitable housing—at least according to the IDOC—the Plaintiffs were again cited for violating the conditions of their release when their release date arrived and, in turn, taken back into custody. *E.g.*, R. 233 ¶¶ 38-39. Then, just like before, the Plaintiffs were given a subsequent hearing before the PRB. At this hearing, the PRB determined for a

second time that the same violation did not require the individual's parole to be revoked and, as before, approved the Plaintiffs for release. *E.g.*, R. 233 ¶ 40. This cycle continued until the parolee either found a suitable housing location or served out the remainder of his parole time in prison. *E.g.*, R. 233 ¶¶ 43-44, 50; R. 236-5 at 45:21-46:18.

Further compounding the situation is the fact that the PRB and IDOC were aware of this cyclical result. The PRB became frustrated with IDOC because it was approving prisoners for parole release (even though it knew of the prisoners' original housing request that was not approved), yet IDOC was not releasing them because IDOC determined that the prisoners did not satisfy the housing requirements. R. 236-3 at 42:8-22. This happened to some inmates at least 4 or 5 times. R. 236-5 at 41:5-15. Members of the PRB began sending letters to IDOC saying that they might be violating the due process rights of certain sex offenders and that IDOC should stop continuing with its "charade," but IDOC did not change its practices. R. 233 ¶¶ 25-26; *see, e.g.*, R. 236-5 at 57:17-58:11.

Eventually, beginning in 2006, the PRB stopped holding subsequent parole revocation hearings for repeat "host site" violators because its decisions were essentially futile. R. 233 ¶¶ 29-31. The dilemma was the PRB had final approval over which prisoners were to be released and what conditions would be imposed on them, *see* 730 ILCS 5/3-3-1, yet IDOC was responsible for determining whether a parolee was in compliance with the conditions and thus whether the parolee could remain on release. 730 ILCS 5/3-14-2; R. 228-3 at 59:10-11. One authority's power

was seemingly trumped by the other's, leading to an infinite loop of the parolees' release status. R. 233 ¶¶ 30-31. This Kafkaesque loop continues today.

## III.  Procedural Posture

The Plaintiffs in this case became caught in the infinite loop resulting from the turnaround practice. As a result, Murdock filed this action nearly five years ago on February 25, 2008, against numerous Defendants, including then-IDOC Director Roger E. Walker;[7] IDOC Deputy Director of Parole Operations Jesse Montgomery; and then-PRB Chairman Jorge Montes. R. 1. Murdock claimed that the Defendants denied him of his right to parole release without due process and sought an injunction barring the Defendants from continuing the turnaround practice, in addition to damages and costs. R. 1. At some point, certain Defendants were dismissed and additional Plaintiffs were added to the suit, which Judge Manning certified as a class action on June 7, 2011. R. 55, 99, 137. Now remaining in the suit are Plaintiffs Murdock, Tony Hoefke, Donald Fulk, Debra Riley, Travares Humphires, Shane Taylor, Gabriel England, Howard Hodges, Albino Martinez, Sherman Jilton, and Durell Scott, Jr., individually and on behalf of all others similarly situated; and Defendants Walker, Montgomery, Director of IDOC Michael Randle, and IDOC Chief of Staff James Reinhart. R. 107. No current or former member of the PRB remains as a defendant.

---

[7] Walker died on March 10, 2012, R. 184, and the Plaintiffs filed a motion to substitute the current director of the IDOC as a replacement Defendant. R. 199. In light of this decision, that motion is denied as moot.

## LEGAL STANDARD

Summary judgment under Federal Rule of Civil Procedure 56 is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To defeat summary judgment, the non-moving party must produce more than a "mere scintilla of evidence," meaning "evidence on which [a] jury could reasonably find for the non-moving party." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). In ruling on the motion, the Court considers the entire evidentiary record and "view[s] all facts and draw[s] all inferences in the light most favorable to the non-moving party." *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013); *Egan Marine Corp. v. Great Am. Ins. Co.*, 665 F.3d 800, 811 (7th Cir. 2011).

## ANALYSIS

Both sides contend they are entitled to summary judgment.[8] The Defendants argue that summary judgment in their favor is appropriate for three reasons: (1) the Plaintiffs improperly brought this suit under 42 U.S.C. § 1983 instead of under 28 U.S.C. § 2254; (2) the Defendants acted in conformance with Illinois statutory law when enforcing the housing provisions, so there is no due process or equal protection violation; and (3) in any event, they are entitled to qualified immunity. R.

---

[8] Because the Court is addressing cross-motions for summary judgment, the Court is careful to note that it views all facts and draws all inferences in favor of the non-moving party on a given issue.

220. The Plaintiffs contend that summary judgment in their favor is required because there is no genuine issue of material fact that the Defendants denied them their right to parole release without due process by violating established Illinois law. R. 224, R. 227.

## I.    Claims under 42 U.S.C. § 1983

The Court begins with the Defendants' claim that they are entitled to summary judgment because the Plaintiffs improperly brought their suit under 42 U.S.C. § 1983, as opposed to under 28 U.S.C. § 2254. In order to establish a claim under § 1983, a plaintiff must establish that the defendant deprived him of an established constitutional right. *See Waubanascum v. Shawano Cnty.*, 416 F.3d 658, 665 (7th Cir. 2005). However, "a prisoner in state custody cannot use a § 1983 action to challenge 'the fact or duration of his confinement.'" *Wilkinson v. Dotson*, 544 U.S. 74, 78 (2005) (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 489 (1973)). Those situations require a prisoner to seek habeas relief under § 2254. *Wilkinson*, 544 U.S. at 78-79. As the Seventh Circuit has explained:

> If the prisoner is seeking what can be fairly described as a quantum change in the level of custody—whether outright freedom, or freedom subject to the limited reporting and financial constraints of bond or parole or probation, . . . then habeas corpus is his remedy. But if he is seeking a different program or location or environment, then he is challenging the conditions rather than the fact of his confinement and his remedy is under civil rights law, even if, as will usually be the case, the program or location or environment that he is challenging is more restrictive than the alternative he seeks.

*Glaus v. Anderson*, 408 F.3d 382, 386-87 (7th Cir. 2005) (quoting *Graham v. Broglin*, 922 F.2d 379, 381 (7th Cir. 1991)).

The Plaintiffs in this case are challenging the Defendants' earlier-described turnaround practice, contending that it deprives them of a protected liberty interest without due process. R. 107. Although part of the relief sought may enable some of the class to be released at an earlier point in time, it is undisputed that at one point in the case, all of the named Plaintiffs had already served their full criminal sentence. R. 99. The suit is, therefore, not simply about challenging the fact or duration of one's confinement, seeking immediate release from prison, or shortening one's confinement. Even for the putative class, the challenge is to the *procedures* used to deny them their release and includes a request for damages for extra time spent in jail; it is not a direct request for release. Thus, the Plaintiff's claims were properly brought under § 1983, and the Defendants are not entitled to summary judgment on this ground. *See Wilkinson*, 544 U.S. at 82 ("[W]e conclude that respondents' claims are cognizable under § 1983, i.e., they do not fall within the implicit habeas exception. Dotson and Johnson seek relief that will render invalid the state procedures used to deny parole eligibility (Dotson) and parole suitability (Johnson). Neither respondent seeks an injunction ordering his immediate or speedier release into the community.") (internal citation omitted).

## II.    Procedural Due Process

"The Due Process Clause of the Fifth and Fourteenth Amendments prohibits deprivation of life, liberty, and property without due process of law." *Matamoros v. Grams*, 706 F.3d 783, 789 (7th Cir. 2013) (citing U.S. Const. amends. V, XVI). The Plaintiffs claim that the turnaround practice violates their right to procedural due

process. R. 107. To succeed on such a claim, the Plaintiffs must prove that: (1) they have a cognizable liberty interest under the Fourteenth Amendment; (2) they were deprived of that liberty interest; and (3) the deprivation was without due process.[9] *Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013) (citing *Khan v. Bland*, 630 F.3d 519, 527 (7th Cir. 2010); *Polenz v. Parrott*, 883 F.2d 551, 555 (7th Cir. 1989)). Both sides claim they are entitled to summary judgment, so the Court looks to each of the elements to determine whether there is a genuine issue of material fact that precludes judgment in favor of either side.

## A. Cognizable Liberty Interest

A liberty interest may arise from the Due Process Clause itself "by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (internal citations omitted). The parties agree that the liberty interest at issue is the Plaintiffs right to release from prison on parole, which the U.S. Supreme Court has said is not a "constitutional or inherent right" of a prisoner serving a sentence after being convicted of a crime. *See Greenholtz v. Inmates of Neb. Penal & Correctional Complex*, 442 U.S. 1, 7 (1979) ("There is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence."). Moreover, the Supreme Court of Illinois has held

---

[9] The Plaintiffs must also establish that the Defendants were state actors when depriving the Plaintiffs of their protected liberty interest, *Doyle v. Camelot Care Ctrs., Inc.*, 305 F.3d 603, 616 (7th Cir. 2002), but this is undisputed. *See* R. 233 ¶ 4 ("At all times herein mentioned Defendant[s] . . . were employed by the IDOC, and were acting under color of state law as employees, agents, or representatives of the IDOC. Response: Admit").

that "the Illinois parole statute does not create a legitimate expectation of parole that rises to the level of a liberty interest protected by procedural due process." *Hill v. Walker*, 948 N.E.2d 601, 605-06 (Ill. 2011). It thus follows that the Plaintiffs, simply as prisoners *hoping* for early release, are not entitled to due process protections. *See Montgomery v. Anderson*, 262 F.3d 641, 644-45 (7th Cir. 2001); *Heidelberg v. Ill. Prisoner Rev. Bd.*, 163 F.3d 1025, 1027 (7th Cir. 1998); *Woodruff v. Ryker*, No. 08 C 1149, 2011 WL 3859767, at *2 (C.D. Ill. Sept. 1, 2011).

Nonetheless, although that basic tenet may be true, the Plaintiffs here are not contesting a "hope" for or a "unilateral expectation" of early release. The Defendants admit the Plaintiffs were in fact *granted* their release. R. 233 ¶ 12. When the state has actually made a promise that entitles the individual to the desired "synthetic liberty,"[10] an exception to the basic tenet precluding due process protections has been created. *See Montgomery*, 262 F.3d at 644. Once the PRB approved the Plaintiffs for early release, that approval became a form of statutory liberty that could not be revoked without appropriate procedures. *See Carter v. Gaetz*, No., 09 C 517, 2010 WL 1657296, at *1 (S.D. Ill Apr. 23, 2010) ("[P]arole—like good time credits that have been awarded—'is a form of statutory liberty once the prisoner has been released.' *Montgomery*, 262 F.3d at 644. As such, once released, states must use 'appropriate procedures' before revoking parole . . . once bestowed." (citing *id.* at 644-45)). Thus, there is no genuine issue of material fact as

---

[10] "Opportunities for early release, such as parole or pardon, constitute either property interests or a form of synthetic liberty, and then only if the state has a made a promise." *Montgomery*, 262 F.3d at 644

to element one: the Plaintiffs had a cognizable liberty interest in being released from prison once the PRB granted release on parole.

### B. Deprivation of a Liberty Interest

A person is deprived of a protected Fourteenth Amendment liberty interest when "a right or status previously recognized by state law [is] distinctly altered or extinguished." *Paul v. Davis*, 424 U.S. 693, 711-12 (1976); *see Hannemann v. S. Door Cnty. Sch. Dist.*, 673 F.3d 746, 753-55 (7th Cir. 2012). There is no dispute here that the PRB approved the Plaintiffs for parole, R. 233 ¶ 12, and that the Plaintiffs were not actually released because they did not have an "approved home site." R. 233 ¶¶ 20-21. Accordingly, the uncontroverted evidence establishes that the Plaintiffs were deprived of a liberty interest, requiring the protections of due process. *See Morrissey*, 408 U.S. at 482 ("[T]he liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee and often on others. . . . By whatever name, the liberty is valuable and must be seen as within the protection of the Fourteenth Amendment. Its termination calls for some orderly process, however informal."); *accord Atkins v. City of Chi.*, 631 F.3d 823, 827-28 (7th Cir. 2011).

### C. Deprivation with or without Due Process

The third element—i.e., whether the Defendants were denied their release from prison without due process—is the major issue in this case. This is a complicated issue because due process is not a static concept. Rather, due process requires government to follow "reasonable procedures" in making its liberty

determinations. *Atkins*, 631 F.3d at 827 (citing *Hernandez v. Sheahan*, 455 F.3d 772, 777 (7th Cir. 2006)). The Court balances three factors to determine whether the procedures afforded were reasonable under the circumstances presented: "[f]irst, the private interest that [was] affected by the official action; second, the risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mann*, 707 F.3d at 879 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)) (alteration in *Mann*). In this particular case, the Court must balance (1) the Plaintiffs' "conditional liberty properly dependent on observance of special parole restrictions," with (2) the State of Illinois' procedures for verifying a parolee's compliance with his parole conditions and reviewing whether revocation should occur; in conjunction with (3) the State's interest in "imposing extensive restrictions on the individual's liberty" and the "recognition that with many prisoners there is a risk that they will not be able to live in society without committing additional antisocial acts." *Morrissey*, 408 U.S. at 480-84.

The Plaintiffs' contention about what due process is required in a situation involving inmates who were previously convicted of sex offenses and are unable to satisfy the housing requirements for early release is not entirely clear. With that said, the Court gleans the following due process arguments from the Plaintiffs' motions for summary judgment: (1) the dual structure for parole release and

revocation under Illinois law is impermissible under the Due Process Clause; (2) the Defendants are violating Illinois law (and in turn violating the Due Process Clause) by: (a) failing to provide the Plaintiffs with a preliminary hearing within 10 days, (b) failing to provide the Plaintiffs with a full revocation hearing within the timeframe outlined in *Morrissey*, 408 U.S. at 488; and (c) denying, revoking, or setting conditions for their conditional release when only the PRB has that authority, *see* 730 ILCS 5/3-3-1(a)(5); R. 224 at 4-5, 8-10; and (3) the turnaround practice fails to provide the Plaintiffs with "sufficient notice as to why and/or how their home site is unsuitable," R. 224; and therefore, is "inherently vague" and "traps" the inmates at issue. R. 224 at 7.

### (1) Impermissible Statutory Scheme

The Illinois scheme for parole gives authority to both the PRB and IDOC. The PRB determines who can be released and the conditions of their release, while IDOC enforces the conditions and reincarcerates (or does not release) those who are not in compliance with the conditions. The Plaintiffs do not direct the Court to any case or relevant authority prohibiting a state from establishing a dual scheme like this. To the contrary, the Supreme Court has held that each State must legislate its own scheme, requiring only that the procedures comply with the minimum requirements of due process:

> (a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses . . . ; (e) a "neutral and detached" hearing body such as a traditional parole board

. . . ; and (f) a written statement by the fact finders as to the evidence relied on and reasons for revoking parole.

*Morrissey*, 408 U.S. at 489. There is no evidence here that the scheme for parole release and revocation in Illinois as codified does not include these minimum requirements. *But see Atkins*, 631 F.3d at 827 ("Illinois's procedures . . . comply with the standard set forth in the *Morrissey* case." (citing *Faheem-El v. Klincar*, 841 F.2d 712, 722-23 (7th Cir. 1988) (en banc))). Thus, the Illinois scheme in and of itself is constitutional.

### (2) Violation of Illinois Law

The Plaintiffs contend they did not receive a preliminary hearing within 10 days of being denied release by IDOC after previously having been granted parole by the PRB. In *Morrissey*, the Supreme Court held that there should be a "'preliminary hearing' to determine whether there is probable cause or reasonable ground to believe that the arrested parolee has committed acts that would constitute a violation of parole conditions." *Morrissey*, 408 U.S. at 485. The Plaintiffs submitted a document titled "Notice of Rights, Preliminary Parole Revocation Hearing," which was signed by Plaintiff England, and states:

> You have a right to a Preliminary Parole/Mandatory Supervised Release Revocation Hearing within 10 business days of imprisonment pursuant to the execution of a parole violation warrant to determine whether or not probable cause exists that you did commit one or more violations of your conditions of parole or mandatory supervised release.

R. 225-7 at 4-5. The issue is therefore, first, whether the Defendants, as employees of the IDOC, were responsible for any violation of the Illinois preliminary hearing

procedures; and if so, second, whether any delay or lack of a preliminary hearing constitutes a violation of the Plaintiffs' due process rights.

The Plaintiffs claim that at least some of them did not receive a preliminary hearing after being denied release due to the IDOC's determination that they did not have a suitable host site location. *See, e.g.*, R. 233 ¶¶ 37, 48-49. For purposes of the Defendants' motion for summary judgment, the Court will consider that to be true. But even if true, the Plaintiffs are confronted with an insurmountable hurdle: the Defendants are not responsible for conducting preliminary revocation hearings. The Illinois regulations provide as follows:

> Preliminary Hearing: When it is charged that the parolee has violated a condition of his parole agreement, he shall be given a written notice informing him of the conditions of parole which have allegedly been violated and the manner in which they were violated. He shall be informed of the date, time, and place at which he will be called before a hearing officer *authorized by the Prisoner Review Board* for a preliminary hearing of the alleged violation.

20 Ill. Admin. Code § 1610.140 (emphasis added); *see* 730 ILCS 5/3-3-9(c). If the Defendants, all IDOC employees, had no role in the alleged constitutional violation, they cannot be held liable for any conduct that may have contributed to it. *See Mann*, 707 F.3d at 877 n.4 (citing *Doyle*, 305 F.3d at 616). Accordingly, because the PRB is the only entity instilled with the overall authority to authorize a hearing officer to conduct a preliminary hearing,[11] and there is no evidence establishing that

---

[11] Judge Manning previously dismissed Montes from the case because "his duties as the chairman of the Prisoner Review Board are judicial in nature and he is therefore entitled to absolute immunity." R. 55 (citing *Wilson v. Kelkhoff*, 86 F.3d 1438, 1443-44 (7th Cir. 1996)).

the remaining Defendants had any direct personal role or influence on any alleged failure to conduct a preliminary hearing, the Plaintiffs' claim on this ground fails.

A greater cause for concern is the PRB's decision to stop conducting revocation hearings. *Morrissey* made clear that revocation hearings "*must* be tendered within a reasonable time." *Morrissey*, 408 U.S. at 488 (emphasis added). Yet, as Montes explained in his March 10, 2006 letter to Defendant Walker:

> The Board believes that continuing this cycle is counterproductive to the inmates, the Board and DOC. The inmate is granted false hope that he will be released and he becomes angry when he is not. The Board has to deal with irate inmates and ever growing dockets. I fully understand this is a highly complex and difficult problem for IDOC. The Board does not believe that it should continue with what most consider a charade. *The Board has documented that it will no longer hear these cases. Therefore, they will no longer be placed on the docket.*

R. 236-5 at 3 (emphasis added). All parties agree that is what occurred; the PRB took certain parolees off the docket, so those parolees did not receive an additional subsequent revocation hearing.

The Plaintiff's claim on this ground also fails, however, because the undisputed evidence demonstrates that the *PRB* made the decision to stop holding the hearings, as its members were "troubled" that the inmates were caught in the cycle, and they no longer wanted to participate in the "charade." *See* R. 236-5 at 1-9. Undeniably, as is the case with preliminary hearings, Illinois law instills the PRB with the power to conduct a complete revocation hearing, not the IDOC. *See* 730 ILCS 5/3-3-9(e). IDOC's findings and/or enforcement of the housing conditions (leading to the turnaround practice) may warrant a revocation hearing being held, but IDOC cannot unilaterally order a hearing or, alternatively, prevent one from

taking place. That is the sole authority of the PRB, so these Defendants—again, as IDOC employees—cannot be held responsible for the PRB's autonomous decision to stop holding revocation proceedings.

The Plaintiffs' final claim regarding an alleged violation of Illinois law is that "[t]he 'turnaround' [practice] further violates Plaintiff's due process rights because the IDOC has no authority to revoke parole, find violations of parole and continually overrule IDOC determinations on supposed parole violations." R. 224 at 7. The Plaintiffs' argue that only the PRB has that authority, and they are correct. But while true, this conclusory statement is belied by the facts of what actually occurs in the current Illinois parole system.

Even assuming that a failure by the IDOC to comply with Illinois law equates to a violation of the Plaintiff's constitutional due process rights (which might not be true),[12] no evidence has been put forth demonstrating the Defendants failed to comply with Illinois law here. The Plaintiffs' sole basis for their claim is they believe the Defendants are usurping the PRB's release authority by finding violations even

---

[12] A "violation of state procedures does not automatically equate to a violation of [one's] due process rights." *Mann*, 707 F.3d at 882 (citing *Ault v. Speicher*, 634 F.3d 942, 947 (7th Cir. 2011) ("[E]ven if Plaintiff could show Defendant violated Illinois law, failure to comply with state procedures does not demonstrate the violation of Plaintiff's clearly established constitutional due process rights.")). If the Defendants were responsible for the alleged failure to conduct a preliminary hearing or made the decision to stop conducting revocation hearings for those stuck in the loop, the Court would be required to analyze whether the failure to conduct a preliminary hearing in 10 days (or at all), combined with the additional procedures in place or the scheme as a whole, satisfies the requirements of due process. *See Dupuy v. Samuels*, 397 F.3d 493, 504 (7th Cir. 2005). Nevertheless, the Court is not required to conduct such an analysis.

after the PRB has said the sex-offender parolees should be released. R. 224 at 8. This might be true to some extent—e.g., IDOC is not releasing prisoners even though they have a valid release order—but it is not in violation of Illinois law. The Plaintiffs completely ignore 20 Ill. Admin. Code § 1610.110, which provides:

> a) When an order for release on parole is entered, it shall not be effective and the applicant shall not be released until the Office of Adult Parole Services or Family and Youth Counseling Services has satisfied itself that suitable arrangements have been made for:
>> 1) The applicant's gainful employment and/or education or training programs *and for a proper and approved residence.*
>> 2) The chief administrative officer of the institution shall have the authority *to hold the prospective parolee until these arrangements have been approved.* . . .

(emphasis added).

The PRB determines who is entitled to be released and who should have their parole revoked, 730 ILCS 5/3-3-7, but it is not vested with the authority to force IDOC to release someone who IDOC does not believe has a suitable housing location. The Plaintiffs direct us to no such authority, and the Court has been unable to find any. The PRB apparently wanted sex-offender parolees released with some conditions, regardless of proper housing, in order to improve the parolees' chances for success upon completion of their entire criminal sentence when they are released with *no* conditions. *See* R. 236-5 at 46:21-47:23. While this might be a legitimate goal, Illinois law does not allow for that. The housing conditions must be satisfied or an inmate cannot be released. *See* R. 228-3 at 59:10-13 ("The [IDOC] retains the right for placement by statute."). The Defendants did not create the overall structure and have simply followed the law, which thereby caused the

turnaround practice. Neither the decision to follow the law of a scheme that comports with due process nor the turnaround practice in and of itself violate the "minimum requirements of due process," as previously discussed. *See* § II.C(1) (citing *Morrissey*, 408 U.S. at 488-89). These Defendants also never "revoked" the Plaintiffs' parole, but rather, reincarcerated the Plaintiffs after they were found to be in violation of their release conditions. This is what the rules in place require, however labyrinthine the overall consequences may be. *See Morrissey.* 408 U.S. at 488 ("We cannot write a code of procedure; that is the responsibility of each State.").

The Plaintiffs direct the Court to Montes' testimony to counter the Defendants' argument that they were simply following the law. Montes testified that for "liability purposes," IDOC thought it was better for the individuals to "max out" their prison time, so that IDOC would not have responsibility over the individuals once they were finally released from prison after serving out the remainder of sentence. R. 228-5 at 82:3-20; *see also* R. 228-3 at 45:3-16; R. 236-5 at 45:21-46:20. The Court takes this as true for purposes of the Defendants' summary judgment motion. But the Plaintiffs must provide *evidence* demonstrating that any alleged mindset influenced IDOC's housing determination because, as a general matter, "courts should not 'strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive.'" *Wis. Educ. Ass'n Council v. Walker*, 705 F.3d 640, 652 (7th. Cir. 2013) (quoting *United States v. O'Brien*, 391 U.S. 367, 383-86 (1968)). The Court here is presented with a practice or procedure as opposed to a statute, although the same rationale applies. At bottom, the turnaround

practice is the result of an imperfect Illinois system, seemingly dictated by a lack of funds to appropriately place all sex-offender prisoners approved for release into acceptable housing when the prisoner cannot afford it himself. *See generally Atkins*, 631 F.3d at 829 ("It is far from clear, therefore, that there would be a gain in accuracy . . . , let alone a gain great enough to outweigh the administrative burden that such a requirement would place on the state—a state that happens to be on the brink of bankruptcy, if not over the brink."). Whatever animus the Plaintiffs claim the Defendants held towards them when enforcing the housing condition requirement of release, the Plaintiffs have not put forth material, objective evidence of an IDOC practice of improperly enforcing the condition. *But see* R. 228-6 at 29:8-10 ("For some offenders, we may investigate 20 host sites."). Without that, any alleged reasons for the turnaround practice are immaterial.[13]

In short, it is true that the Plaintiffs had a right to release once the PRB issued a release order, but that right was subject to appropriate conditions being met. The Plaintiffs did not satisfy a required condition, so the Defendants did not violate the Plaintiffs' right to release by complying with the State of Illinois's

---

[13] Although addressing a different situation, the Ninth Circuit recently held that prison officials may raise a lack of available resources as a defense to claims for money damages brought under 42 U.S.C. § 1983. *Peralta v. Dillard*, ___ F.3d ___, 2014 WL 878830, at *4 (9th Cir. Mar. 6, 2014) (en banc) ("A prison medical official who fails to provide needed treatment because he lacks the necessary resources can hardly be said to have intended to punish the inmate. The challenged instruction properly advised the jury to consider the resources [the defendant] had available in determining whether he was deliberately indifferent.").

constitutional regulations preventing IDOC from releasing parolees without proper housing.[14]

### (3) Adequate Notice

"The purpose of notice under the Due Process Clause is to allow an interested party to challenge the deprivation of a protected liberty interest before it occurs." *Matamoros*, 706 F.3d at 790. Additionally, "[t]he void for vagueness doctrine rests on the basic due process principle that a law is unconstitutional if its prohibitions are not clearly defined." *Hegwood v. City of Eau Claire*, 676 F.3d 600, 603 (7th Cir. 2012). The Plaintiffs contend that the turnaround practice violates their due process rights because "the process and policy by which the IDOC found 'violations' of parole was woefully vague" and they did not receive "prior notice that their home site was disapproved." R. 224 at 6. The Defendants' response brief does not specifically address the practice being "vague," as they only say that "the policies in effect and implemented by the Defendants are mandated by the laws of the State of Illinois." R. 232 at 3.

Initially, the Plaintiffs are not challenging the actual Illinois statutes and regulations related to sex-offender release conditions. R. 247 at ¶ 23 ("Plaintiffs have not challenged conditions that may be applicable to sex offenders."). They

---

[14] The main problem with the scheme is that the PRB issues a release order before IDOC has the opportunity to verify that the parolee's host site is permissible or, conversely, that the PRB issues a release order at the revocation hearing despite the IDOC's prior determination that the parolee lacked an appropriate host site. The scheme may be constitutional, but it also allows two separate authorities to make valid, yet contradicting determinations. The resolution of this problem requires legislative rather than judicial action

make no argument that the laws as written do not sufficiently put them on notice of the particular conditions they must satisfy or, generally, that they are subject to certain conditions on parole.[15] This is different than most cases involving "fair warning" arguments where the party is claiming that "a criminal statute . . . fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute." *United States v. Mire*, 725 F.3d 665, 672 (7th Cir. 2013) (quoting *United States v. Harriss*, 347 U.S. 612, 617 (1954). The Plaintiffs do not claim that they could not figure out what type of housing location satisfies the host site conditions. Instead, they say the practice "makes it impossible for them to be in compliance with the conditions of parole prior to the finding of a violation." R. 224 at 7. This argument, however phrased, is without merit.

The turnaround practice is essentially mandated by the laws of Illinois; the Defendants would be violating Illinois law if they released someone or failed to reincarcerate someone who was in violation of his housing conditions. Accordingly, the "practice" is not in and itself vague, as previously explained, because Illinois law provides that sex-offender parolees will only be released—and remain out of prison—*if* they continue to abide by the conditions. *E.g.,* R. 236-7. The Plaintiffs did not do that here—they were not found to be in compliance with the housing condition, and so they were not released. That the practice "has the effect of making each Plaintiff a parole violator by default, despite their best efforts and beliefs" as a

---

[15] "Plaintiffs' case does not concern 'host sites' or Defendants['] obligations under Illinois law in obtaining host sites for Plaintiffs as parolees. Plaintiff's case does concern the denial of due process rights afforded to them as parolees, once the PRB has lawfully granted Plaintiffs' parole." *See* R. 238 at 10.

result of the PRB's release order, R. 224 at 6-7, is no doubt an unfortunate situation. Contrary to the Plaintiffs' contention, however, they can be in compliance with the conditions of parole before a violation is found during the turnaround practice (or after they are reincarcerated): they can find a suitable host site location. Additionally, if they disagree with IDOC's host site determination, they can challenge the determination or file a grievance, which may lead to a new investigation of the parolee's release plan. *See* R. 228-3 at 61:3-24; R. 236-4 at 80:15-21.

Moreover, there is no dispute that *some* sex-offender parolees are released on parole despite the turnaround practice. The *turnaround practice*—what is at issue here, as opposed to the statutory scheme as a whole—does not "lull[] the potential [parole violators] into a false sense of security," *cf. Bouie v. City of Columbia*, 378 U.S. 347, 352 (1964), because it has nothing to do with the PRB's release order. The only evidence in the record is that the parolees are notified prior to their release date when their housing location is not approved. R. 228-6 at 22:16-19. The parties also agree, as a general matter, that IDOC: (1) prepares an individual for parole prior to his release; (2) goes over the rules of parole with the parolees; and (3) reviews the PRB's conditions for a given parolee. R. 233 ¶ 16; R. 225-6 at 9:16-21; *see also* IDOC Admin. Directive No. 04.50.115 (effective Nov. 1, 2007) (discussing the process IDOC employees must follow to prepare parolees for their release). And the Plaintiffs have not argued that did not occur here. *Cf. Matamoros*, 706 F.3d at 790 ("Matamoros has not asserted that he was not informed of the special parole

term at his original sentencing in January 1983, and thus, we assume that he was in fact so notified.").

The undisputed evidence is sex-offender parolees subject to the turnaround practice are put on notice that IDOC must approve their host site location before they can be released, and further notified if/when their host site location is not approved. The Court, therefore, finds that the turnaround practice provides sufficient "notice" under the due process clause. *See Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989) (explaining that the due process clause does not demand "perfect clarity and precise guidance"); *Hegwood*, 676 F.3d at 603 ("[A] statute is only unconstitutionally vague 'if it fails to define the offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and it fails to establish standards to permit enforcement in a nonarbitrary, nondiscriminatory manner.'" (quoting *Fuller v. Decatur Pub. Sch. Bd. of Educ. Sch. Dist. 61*, 251 F.3d 662, 666 (7th Cir. 2001))).

## III.    Equal Protection

In addition to their due process allegations, the Plaintiffs make a bald assertion in their third amended complaint that the turnaround practice violates the Equal Protection Clause of the Constitution, presumably through the Fourteenth Amendment.[16] R. 107. The Supreme Court has distinguished between "due process" and "equal protection":

––––––––––––––––––––––––––

[16] The Court is not entirely sure if the Plaintiffs have abandoned their equal protection claim, as their motion for summary judgment is devoid of any reference to equal protection, *see* R. 224, R. 226; and they did not refer to any alleged equal

> "Due process" emphasizes fairness between the State and the individual dealing with the State, regardless of how other individuals in the same situation may be treated. "Equal protection," on the other hand, emphasizes disparity in the treatment by a State between classes of individuals whose situations are arguably indistinguishable.

*Ross v. Moffitt*, 417 U.S. 600, 609 (1974). The Plaintiffs' summary judgment motion does not address equal protection, though the Defendants' brought the claim within the purview of their motion by highlighting the Plaintiff's allegations that "their re-incarceration was/is in violation of their Fourteenth Amendment Due Process and Equal Protection rights." R. 219 at 2; *see Diadenko v. Folino*, No. 12-3091, 2013 WL 6680930, at *6 (7th Cir. Dec. 19, 2013) ("[S]ummary judgment is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." (quoting *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008))).

The Defendants use the same argument regarding equal protection that they use to supports their due process argument, arguing that the turnaround practice is in compliance with Illinois law. The Court has already described why it agrees with that argument. But this is not determinative of an equal protection claim, which is "based on the principle that, under 'like circumstances and conditions,' people must be treated alike, unless there is a rational reason for treating them differently." *LaBella Winnetka, Inc. v. Vill. of Winnetka*, 628 F.3d 937, 941 (7th Cir. 2010) (citing *Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591, 601-02 (2008)). Thus, whether the

---

protection violation in their "Reassignment Status Report," which was filed on January 27, 2014. R. 250. Nonetheless, for purposes of the Defendants' motion for summary judgment, the Court construes the Plaintiffs' claim in the light most favorable to the Plaintiffs and will, thus, consider the claim as still being at issue.

turnaround practice complies with Illinois law is not indicative of, first, whether individuals subject to it are treated alike; and if not, second, whether there is a rational basis for the disparate treatment. The Defendants failed to address either of these essential issues, and the Court cannot fault the Plaintiffs for not responding to an issue the Defendants did not raise. *Edwards v. Honeywell*, 960 F.2d 673, 674 (7th Cir. 1992) ("When a party moves for summary judgment on ground A, his opponent is not required to respond to ground B—a ground the movant might have presented but did not." (quoting *Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1310 (7th Cir. 1989))). Without more, and assuming the Plaintiffs have not abandoned the claim, the Court cannot conclude there is no genuine issue of material fact on the equal protection claim.

## IV.    Qualified Immunity

Because the Defendants have not delineated why the equal protection claim cannot survive summary judgment, the Court will address the Defendants' contention that they are nonetheless entitled to qualified immunity on both the equal protection and due process claims. "Qualified immunity 'protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Engel v. Buchan*, 710 F.3d 698, 708 (7th Cir. 2013) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). To defeat such a defense, the Plaintiffs must "(1) present case law that has articulated both the right at issue and applied it to a factual circumstance similar to

31

the one at hand, or (2) demonstrate that the 'contours of the right are so established as to make the unconstitutionality obvious.'" *Ault v. Speicher*, 634 F.3d 942, 946 (7th Cir. 2011) (quoting *Boyd v. Owen*, 481 F.3d 520, 526-27 (7th Cir. 2007)). The Seventh Circuit has "said that '[f]or qualified immunity to be surrendered, preexisting law must dictate, that is, truly compel . . . the conclusion for every like-situated, reasonable government agent that what [he] is doing violates federal law *in the circumstances*.'" *Volkman v. Ryker*, 736 F.3d 1084, 1090 (7th Cir. 2013) (quoting *Khuans v. Sch. Dist. 110*, 123 F.3d 1010, 1019-20 (7th Cir. 1997) (emphasis in original)). The Plaintiffs have not met that burden here.

Looking to the second prong of the test,[17] this case is similar to *Volkman* in that the Plaintiffs do nothing more than direct the Court to *Morrissey*, which demonstrates that the *general* right to due process and equal protection regarding parole release is clearly established. R. 238 at 10-12 (citing *Morrissey*, U.S. at 481-88); *see Volkman*, 736 F.3d at 1090. There is no dispute, however, that prior cases demonstrate that parolees are generally entitled to due process and equal protection, which at a minimum includes certain revocation hearings and notice of violations. *See, e.g.*, *Morrissey*, 408 U.S. at 488; *Atkins*, 631 F.3d at 828. The Plaintiffs must further demonstrate how the law regarding *the turnaround practice*

---

[17] *See Hernandez v. Sheahan*, 711 F.3d 816, 817 (7th Cir. 2013) ("Courts may exercise discretion in deciding which question to address first.").

as applied violates a certain right related to their parole release.[18] *See Estate of Escobedo v. Bender*, 600 F.3d 770, 779 (7th Cir. 2010) (stating that the plaintiff "has the burden of establishing that the constitutional right at issue was clearly established").

Instead of directing the Court to any case that could arguably be analogized to the situation at issue here, the Plaintiffs take the second route, arguing in a conclusory fashion that "[n]o reasonable IDOC official would believe they may abrogate the PRB's authority and single-handedly set conditions, [find a violation], and revoke parole." R. 238 at 12. This argument misses the mark, however, because as discussed above, the Defendants are following Illinois law, which requires the IDOC to monitor and enforce the PRB's conditions and those mandated by Illinois statute. That includes the residency and electronic home monitoring requirement, which the IDOC cannot pick and choose to enforce.

The statutory scheme in place has problems that should be addressed, though that is a public policy issue for the Illinois legislature. *See generally Riccardo v. Rausch*, 375 F.3d 521, 525 (7th Cir. 2004) ("[P]risons are dangerous places. Inmates get there by violent acts, and many prisoners have a propensity to commit more. Guards cannot turn away persons committed by the courts; nor do individual guards have any control over crowding and other systemic circumstances."). IDOC cannot control what parolees it is required to supervise (or the parolees' ability to

---

[18] As discussed above, even assuming all of the Plaintiffs' allegations are true, the Defendants cannot be held liable here for the PRB's alleged failure to conduct a preliminary or full revocation hearing. *See* § II.C(2).

satisfy their release conditions). In a situation like this with few answers, a reasonable person would not believe that a state actor is violating a person's constitutional rights when the individual is acting in accordance with state law. Accordingly, the implementation and enforcement of the turnaround practice is not so "patently violative of [a] constitutional right that reasonable officials would know without guidance from a court." *Estate of Escobedo*, 600 F.3d at 780 (citing *Hope v. Pelzer*, 536 U.S. 730, 739-40 (2002)); *see Thayer v. Chiczewski*, 697 F.3d 514, 533 (7th Cir. 2012), *as amended* 705 F.3d 237 (7th Cir. 2012) (concluding that the defendant was entitled to qualified immunity because, "[g]iven the uncertainty in the law and unique factual situation at issue here, the constitutional question was not beyond dispute"). This conclusion is further bolstered by an Illinois appellate court's interpretation of the Illinois regulations, concluding that IDOC does not have a duty to find parolees suitable housing locations. *See Lucas*, 967 N.E.2d at 835 (holding that IDOC has "no statutory or regulatory *duty* to obtain a residential placement for plaintiff that would enable him to comply with the electronic monitoring that was a condition of his MSR (although [I]DOC had statutory *authority* to try to do so"). If IDOC cannot release a sex-offender parolee because he does not have a proper host site location and IDOC does not have a duty to find that person a proper location, a permissible option would seem to be the IDOC keeping the person incarcerated. That is what the turnaround practice ultimately entails.

The ongoing questions of when and how Illinois parolees convicted of sexual offenses should be released, where they may reside, and what IDOC should do with

sex-offender parolees who are approved for release but cannot satisfy the release conditions are as complicated as they are novel. They are also questions the Court is not in a position to answer. *See Al-Alamin v. Gramley*, 926 F.2d 680, 688 (7th Cir. 1991) ("[I]t is not the prerogative of the federal courts to micromanage the penal system of a state."). The undisputed material evidence before the Court, coupled with the absence of case law that would reasonably put the Defendants on notice that the turnaround practice violates any protected right of the Plaintiffs in this situation, demonstrates the Defendants are entitled to qualified immunity. *See Colaizzi v. Walker*, 812 F.2d 304, 308 (7th Cir. 1987) (explaining that "the test for immunity should be whether the law was clear in relation to the specific facts confronting the public official when he acted").

## CONCLUSION

The Plaintiffs are caught in a system that requires the intervention of the Illinois legislature, not this Court. The uncontroverted evidence establishes that the Defendants did not deprive the Plaintiffs of any established right without due process, and even if they did, they would still be entitled to qualified immunity on all the claims in the Plaintiffs' third amended complaint. Accordingly, the Defendants' motion for summary judgment is granted, R. 219, and the Plaintiffs' motion for summary judgment on behalf of the named Plaintiffs, R. 223, as well as for the class, R. 226, is denied. The Plaintiffs' motion to substitute a party for Walker, R. 199, is denied as moot, and the case is dismissed.

ENTERED:

_Thomas M Durkin_
Honorable Thomas M. Durkin
United States District Judge

Dated: March 10, 2014